BARBARA L. JOHNSON (admitted in pro hac)
barbarajohnson@paulhastings.com
DONNA D. MELBY (admitted in pro hac)
donnamelby@paulhastings.com
PAUL, HASTINGS, JANOFSKY & WALKER LLP
515 South Flower Street
Twenty-Fifth Floor
Los Angeles, CA 90071-2228
Telephone: (213) 683-6000
Facsimile: (213) 627-0705

JAY A. ZWEIG
jay.zweig@bryancave.com
BRYAN CAVE LLP
One Renaissance Square
Two North Central Ave., Suite 2200
Phoenix, AZ 85004-4406
Telephone: (602) 364-7300
Facsimile: (602) 716-8300

Attorneys for Defendant
SMITHKLINE BEECHAM CORPORATION

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| MICHAEL SHANE CHRISTOPHER, filing individually and on behalf of all others similarly situated; and FRANK BUCHANAN, filing individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>vs.<br><br>SMITHKLINE BEECHAM CORPORATION, d/b/a GLAXOSMITHKLINE,<br><br>Defendant. | NO. CV 08-01498-PHX-FJM<br><br>STATEMENT OF MATERIAL FACTS IN SUPPORT OF DEFENDANT SMITHKLINE BEECHAM CORPORATION d/b/a GLAXOSMITHKLINE, PLC'S MOTION FOR SUMMARY JUDGMENT |

Pursuant to Rule 56 of the Federal Rules of Civil Procedure and Rule 56.1 of the Local Rules of the United States District Court for the District of Arizona, SmithKline Beecham Corporation d/b/a GlaxoSmithKline, PLC ("GSK") respectfully submits the following Statement of Material Facts in Support of its Motion for Summary Judgment.

#643935

I.      **MATERIAL FACTS RELATED TO BOTH PLAINTIFFS**

1.      By law, patients cannot purchase prescription drugs without first obtaining a prescription from a healthcare professional. (Declaration of Bettina Stanger ("Stanger Decl."), attached hereto as Exhibit A, at ¶ 9).

2.      As a result, GSK's Pharmaceutical Sales Representatives ("PSRs") cannot sell GSK products directly to patient-consumers. (*Id.*).

3.      Because of regulatory restrictions on the sale of prescription drugs, PSRs may only discuss FDA-approved "on label" uses of GSK products and they must give a balanced presentation of the benefits and risks associated with the products that they are selling. (*Id.* at ¶ 10).

4.      The job description for the PSR position for which Plaintiffs applied lists as its first "key responsibility" to "[s]ell products to [a] specific customer market according to the business plan." (April 22, 2009 Deposition of Michael Shane Christopher ("Christopher Dep."), excerpts attached hereto as Exhibit B, at Ex. 7; April 23, 2009 Deposition of Frank Buchanan ("Buchanan Dep."), excerpts attached hereto as Exhibit C, at Ex. 5).

5.      All GSK PSRs, including Plaintiffs, receive extensive specialized sales training when they are hired. (Declaration of William D. Curtin ("Curtin Decl."), attached hereto as Exhibit D, at ¶ 7).

6.      During GSK's new hire training, PSRs are trained how to "(i) analyze data regarding the prescribing habits of the physicians on whom they call, (ii) plan and prepare to make an effective sales call, (iii) analyze clinical studies concerning their products so that they can anticipate and respond appropriately to customer questions, (iv) engage their customers in meaningful discussions about the products they are selling, (v) gain their customers' interest through engaging communications, (vi) appropriately respond to objections physicians might have to using GlaxoSmithKline products for patients by using questioning techniques and active listening

BRYAN CAVE LLP
TWO NORTH CENTRAL AVENUE, SUITE 2200
PHOENIX, ARIZONA 85004-4406
(602) 364-7000

#643935

1    skills, (vii) convey sales messages in a manner that will be most effective on

2    a particular sales call, (viii) determine what level of commitment should be

3    sought on a particular sales call, and (ix) close the sale by obtaining the

4    desired commitment (*e.g.*, a commitment to prescribe GlaxoSmithKline

5    products for appropriate patients)." (Curtin Decl. ¶ 10).

6    7.   GSK PSRs continue to receive specialized sales training throughout the

7         course of their careers with GSK. (Curtin Decl. ¶¶ 8-15).

8    8.   Since at least 2001, all sales representatives have received extensive sales

9         training on GSK's "Winning Practices." (Curtin Decl. at ¶ 15).

10   9.   The "Winning Practices" curriculum is comprised of the following discrete

11        sales functions: (1) Own the Territory Business, including responsibilities

12        such as "[a]nalyz[ing] what is happening in the territory and understand[ing]

13        why," and planning how "to drive superior sales for each promoted

14        product;" (2) Work as a Team to Drive Results, which focuses on

15        "[c]ollaborat[ing] to deliver seamless selling and service;" (3) Master

16        Professional Knowledge, requiring PSRs to "[d]evelop the expert product

17        knowledge that [their] customers need[ed]" and to "[u]nderstand the clinical

18        management of [their] customers' patients;" (4) Plan Every Call, meaning

19        PSRs should "[o]rganize [their] sales call[s] to maximize [their] selling time

20        and results;" (5) Sell Through Customer-Focused Dialogue, under which

21        PSRs are expected to "[c]reate interest, uncover the customer's need, and

22        effectively position the [GSK] brand" as well as "[c]onfidently deliver the

23        right selling message and create dialogue with compelling content and

24        resources;" (6) Get the Best Possible Commitment On Every Call, meaning

25        PSRs are expected to "[a]sk for the business;" (7) Provide Added Value to

26        the Customer Relationship, meaning "[u]se GSK resources to create value

27        for the customer and business impact for the company." (Christopher Dep.

28        at Ex. 27; Buchanan Dep. at Ex. 14).

BRYAN CAVE LLP
TWO NORTH CENTRAL AVENUE, SUITE 2200
PHOENIX, ARIZONA 85004-4406
(602) 364-7000

10.   A significant component of PSRs' total compensation is incentive compensation. (Declaration of Robert Pellegrino ("Pellegrino Decl."), attached hereto as Exhibit E, at ¶ 6).

11.   GSK's incentive compensation is designed to reward PSRs for meeting certain goals. Successfully achieving the goals set by GSK directly results in higher compensation for PSRs. (*Id.* at ¶¶ 7-11).

12.   When they worked as PSRs, Plaintiffs received incentive compensation based on increasing the market share and/or sales volume for the GSK products for which they were responsible in the territories for which they were responsible. Successfully increasing that market share and/or sales volume directly led to increased compensation for them. (*Id.* at ¶ 11).

II.   **MATERIAL FACTS RELATED TO PLAINTIFF MICHAEL SHANE CHRISTOPHER**

13.   Michael Shane Christopher ("Christopher") began working for GSK on March 31, 2003 as a PSR. (Christopher Dep. at Ex. 3).

14.   Christopher sought out GSK and pursued a PSR position, submitting both paper and online applications for the job before attending a job fair at which he met with GSK recruiters. (*Id.* at 32:14-34:7).

15.   Before he was hired as a PSR, Christopher understood that GSK preferred candidates who had prior selling experience. (*Id.* at 33:8-34:7).

16.   Shortly after being hired as a PSR, Christopher expressed his enthusiasm in joining "The Greatest Sales Team in America" in an email to certain people within GSK. (*Id.* at 57:24-58:24, Ex. 10)

17.   Christopher understood that one of his purposes as a PSR was to promote GSK's products to specific customer markets. (*Id.* at 45:9-20, Ex. 7).

18.   Christopher also understood that GSK's expectation of him as a PSR was to work to develop strategies to increase sales of the products for which he was responsible. (*Id.* at 45:21-46:2, Ex. 7).

BRYAN CAVE LLP
TWO NORTH CENTRAL AVENUE, SUITE 2200
PHOENIX, ARIZONA 85004-4406
(602) 364-7000

#643935

-4-

19. Christopher knew that as a PSR, GSK expected him to meet or exceed sales goals. (*Id.* at 45:9-20, Ex. 7).

20. Christopher knew that as a PSR, his key responsibilities included promoting or marketing GSK's products to customers. (*Id.* at 48:17-22, Ex. 7).

21. Christopher knew that his key responsibilities as a PSR also included developing business plans with the goal of increasing GSK's market share and utilizing "customer-focused selling techniques" to accomplish that goal. (*Id.* at 48:23-49:13, Ex. 7).

22. Christopher was promoted to Pharmaceutical Senior Sales Representative in 2005, but his job duties did not change. (*Id.* at 65:24-66:10, 67:4-6).

23. When Christopher was first hired by GSK, he worked for GSK's Philadelphia Pharma division and his territory was Lexington, Kentucky. (*Id.* at 79:14-80:23, Ex. 3).

24. Christopher later transferred to Phoenix, Arizona, at which point he began working for GSK's RTP Pharma division. (*Id.* at 80:24-81:8).

25. Although he was selling different GSK products after he transferred to RTP Pharma, Christopher's essential job duties as a PSR did not change. (Plaintiffs' Motion for Conditional Collective Action Certification and for *Hoffman-La Roche* Notice [Docket # 29], Ex. 2 at ¶ 6-7; Christopher Dep. at 80:14-81:2).

26. Once Christopher was hired as a PSR, GSK sent him to a three-and-a-half-week in-house training program. (*Id.* at 42:8-43:15, 56:1-5, Ex. 8).

27. Christopher understood that his employment was contingent on his passing the in-house training program, and that part of the in-house training program was sales training. (*Id.* at 40:23-41:18, Ex. 3).

28. After he passed the in-house sales training program, Christopher received training on "The Assertive Selling Always Professional ("ASAP") Selling Model," under which he was taught to gain commitments from his customers

BRYAN CAVE LLP
TWO NORTH CENTRAL AVENUE, SUITE 2200
PHOENIX, ARIZONA 85004-4406
(602) 364-7000

#643935

1    to take specific action (*e.g.*, to prescribe GlaxoSmithKline products to

2    appropriate patients) by asking questions that seek commitments to action.

3    (Curtin Decl. ¶ 12).

4    29.   Christopher also received training as part of GSK's Worldwide Sales Force

5          Excellence ("WSFE") sales initiative on the When? Why? How? ("WWH")

6          approach to sales. (Christopher Dep. at 161:14-162:6; Curtin Decl. ¶13).

7    30.   Christopher also took two self-study, eForce sales training modules while he

8          was a PSR: "Coreg Post-MI Sales Training Program" and "Sales Planning

9          and Performance." (Christopher Dep. at 56:14-57:15, Ex. 9).

10   31.   During his employment GSK trained Christopher in a curriculum GSK calls

11         "Winning Practices." (*Id.* at 82:17-83:9, Ex. 9; Curtin Decl. at ¶ 15).

12   32.   Christopher understood that as a PSR, his performance at GSK was to be

13         rated with respect to each of the "Winning Practices." (Christopher Dep. at

14         131:1-132:6, 134:15-137:21, 159:3-160:9, 203:7-11, Exs. 12, 19-27).

15   33.   In conjunction with the "Winning Practices," Christopher understood that he

16         was expected to "[i]mplement[] [his] own plan to grow the territory."

17         (Christopher Dep. at 134:15-21, Ex. 19).

18   34.   In conjunction with the "Winning Practices," Christopher understood that he

19         was expected to "gain[] insight into key customers." (*Id.* at 134:22-135:8,

20         Ex. 19).

21   35.   In conjunction with the "Winning Practices," Christopher understood that he

22         was expected to "[b]uild[] strong business relationships with customers" (*Id.*

23         at 135:17-21, Ex. 19).

24   36.   In conjunction with the "Winning Practices," Christopher understood that he

25         was expected to "[m]aster[] disease area and product knowledge." (*Id.* at

26         135:22-24, Ex. 19).

27   37.   In conjunction with the "Winning Practices," Christopher understood that he

28         was expected to "[p]repare[] for each call." (*Id.* at 135:25-136:2, Ex. 19).

BRYAN CAVE LLP
TWO NORTH CENTRAL AVENUE, SUITE 2200
PHOENIX, ARIZONA 85004-4406
(602) 364-7000

#643935

-6-

BRYAN CAVE LLP
TWO NORTH CENTRAL AVENUE, SUITE 2200
PHOENIX, ARIZONA 85004-4406
(602) 364-7000

38.   In conjunction with the "Winning Practices," Christopher understood that he was expected to "[e]ngage[] each customer in a dialogue about products." (*Id.* at 137:6-9, Ex. 19).

39.   In conjunction with the "Winning Practices," Christopher understood that he was expected to "[g]ain[] the best possible commitment on every call." (*Id.* at 137:10-13, Ex. 19).

40.   In conjunction with the "Winning Practices," Christopher understood that he was expected to "[c]ontinually add[] value to the customer." (*Id.* at 137:14-17, Ex. 19).

41.   In conjunction with the "Winning Practices," Christopher understood that he was expected to "[d]emonstrate[] initiative, passion and persistence to get results." (*Id.* at 137:18-21, Ex. 19).

42.   Christopher received seven or more "Field Coaching Reports" that assessed his job performance as a PSR against GSK's "Winning Practices." (*Id.* at Exs. 19-21, 23-26).

43.   Christopher viewed it as part of his job as a PSR to "look[] at the data and see[] where to gain business, where to initiate business, and where to steal business." (*Id.* at Ex. 18).

44.   By February 2007, when Christopher had been a PSR for almost four years, he was identifying key customers for the drug Boniva, segmenting them into groups based on sales volume, and focusing his sales efforts on the customers who had the greatest potential for GSK market share growth. (*Id.* at Ex. 25).

45.   Christopher knew that as a PSR he was expected to "deliver[] all the -- the key messages to the right physician at the right time for the entire portfolio [of] products that [he] was responsible for promoting." (*Id.* at 147:20-148:2).

46.   Christopher tailored his message from sales call to sales call, "targeting…the right message to the right people[;]…talking about the right products to the

1    right physician." (*Id.* at 126:6-9, Ex. 18).

2    47.   As a PSR, one of Christopher's objectives was to call on doctors to cause

3    them to write prescriptions for the drugs that he was responsible for selling.

4    (*Id.* at 106:21-25).

5    48.   Christopher was trained to elicit information from physicians by asking them

6    questions and to "get a dialogue going" so that he could overcome

7    physicians' objections to prescribing GSK products. (*Id.* at 153:6-158:18,

8    227:23-228:2).

9    49.   Christopher "buil[t] relationships" with physicians as part of his job as a

10    PSR. (*Id.* at 96:16-21, 148:25-149:12).

11    50.   Christopher "want[ed] to be viewed as a resource and knowledgeable about

12    the disease state and the products that at the time [he] was promoting." (*Id.*

13    at 118:20-22, 148:25-149:12).

14    51.   As a PSR, Christopher independently determined what questions (from

15    among a variety of questions GSK provided to him in his training materials),

16    to ask a physician, thus determining what conversation he would have with

17    him or her and what commitments he would seek from him or her. (*Id.* at

18    156:6-158:18).

19    52.   Christopher chose which of GSK's clinical aids he would use during each

20    interaction with a physician. (*Id.* at 156:17-157:8).

21    53.   Christopher had discretion to decide whether to and how many samples to

22    leave with a physician during a visit. (*Id.* at 192:17-193:25, 194:11-195:6).

23    54.   Christopher understood that as a PSR he was to ask for a commitment from

24    his customer at the end of every call. (*Id.* at 106:10-25).

25    55.   After working as a PSR for only six months (excluding initial training),

26    Christopher received praise and a "Proficient" rating in the Winning Practice

27    of "[g]ain[ing] the best possible commitment on every call."   On his January

28    29, 2004 Field Coaching Report, his District Sales Manager wrote that

BRYAN CAVE LLP
TWO NORTH CENTRAL AVENUE, SUITE 2200
PHOENIX, ARIZONA 85004-4406
(602) 364-7000

-8-

1    Christopher did "a good job of asking for the business and closing

2    customers." (*Id.* at Ex. 21).

3    56.  Christopher routinely sought commitments from his customers at the end of

4         his calls, including "[a]sking for commitments to read clinical reprints that

5         [he] provided for them, ask[ing] them to recall formulary tier status with

6         certain GSK products, ask[ing] for commitments on disease states that they

7         would consider utilizing GSK products for those disease states that were

8         obviously approved for usage in that patient population[,]…ask[ing] for

9         commitment from physicians to attend speaker programs, dinner programs,

10        weekend conventions[,]…[and] [c]ommit[ting] to prescribing medications

11        that [they] had discussed." (*Id.* at 107:4-16).

12   57.  Christopher received praise for a "Good close with Dr. Ahmad asking him to

13        prescribe Boniva for new patients," and "Closing and Bridging" was

14        identified as an area of strength on his February 20, 2007 Field Coaching

15        Report (*Id.* at 167:25-168:6, Ex. 25).

16   58.  GSK did not provide Christopher with an office out of which he could work.

17        (*Id.* at 184:9-14).

18   59.  Christopher's initial base salary as a PSR was $38,500 per year. (*Id.* at

19        40:20-22, Ex. 3).

20   60.  Over the course of his career as a PSR with GSK, Christopher's base salary

21        increased several times.  It was $51,840 per year at the time of his

22        termination. (*Id.* at 203:17-204:17, Ex. 28).

23   61.  In addition to his base salary, a significant portion of Christopher's total

24        compensation was incentive compensation, based on the increase in market

25        share and/or sales volume in his territory of the drugs for which he was

26        responsible. (*Id.* at 46:3-7; Pellegrino Decl. at ¶ 11-12).

27   62.  The incentive compensation variable of Christopher's total pay could have

28        amounted to more than $21,000 per year in additional compensation. (*Id.* at

BRYAN CAVE LLP
TWO NORTH CENTRAL AVENUE, SUITE 2200
PHOENIX, ARIZONA 85004-4406
(602) 364-7000

#643935

1    204:21-205:2, 210:11-24, Ex. 3).

2    63.    Because his incentive compensation as a PSR was weighted differently for

3    each of the drugs he represented, the weighting "to some extent" influenced

4    which prescribers Christopher called on. (*Id.* at 205:20-25).

5    64.    In 2004, Christopher received $29,993 in incentive compensation, which

6    was 41% of his $72,576 in gross pay. (Pellegrino Decl. at ¶ 12).

7    65.    In 2005, he received $21,231 in incentive compensation, which was 32% of

8    his $67,243 in gross pay. (*Id.*).

9    66.    In 2006, Christopher received $28,429 in incentive compensation, which

10   was 37% of his $77,552 in gross pay. (*Id.*).

11   67.    Christopher recognized that "there's a potential that [his] activity,"

12   specifically his "promoting and marketing the products" for which he was

13   responsible, affected his incentive compensation. (*Id.* at 211:19-212:9).

14   68.    The majority of Christopher's work time was spent in the field making sales

15   calls, where he worked from 8:30 a.m. to 5 p.m. each day (40 hours per

16   week). (*Id.* at 173:4-6, 184:23-24).

17   69.    Christopher's District Sales Manager accompanied him on his field visits to

18   healthcare providers "from time to time." The occasions on which his

19   District Sales Manager accompanied him on his physician visits were called

20   "ride-alongs." (*Id.* at 128:25-129:6).

21   70.    On "ride-alongs," Christopher's District Sales Manager evaluated his

22   promotion and marketing of GSK's products via Field Coaching Reports.

23   (*Id.* at 129:14-19).

24   71.    The "ride-alongs" with Christopher and his District Sales Manager occurred

25   only "once a month" or "once every other month." (*Id.* at 143:14-18).

26   72.    Christopher communicated with his District Sales Manager only "daily or

27   every other day," via telephone or email. (*Id.* at 143:19-144:2).

28

BRYAN CAVE LLP
TWO NORTH CENTRAL AVENUE, SUITE 2200
PHOENIX, ARIZONA 85004-4406
(602) 364-7000

BRYAN CAVE LLP
TWO NORTH CENTRAL AVENUE, SUITE 2200
PHOENIX, ARIZONA 85004-4406
(602) 364-7000

73. Although Christopher did not add any physicians to GSK's list of prescriber customers, he was aware that GSK had a process through which he as a PSR could submit physicians' names to be added to the prescriber list. (*Id.* at 295:1-23).

74. Christopher contends that he did not "sell" GSK's products, however, he admits that he "promoted" and/or "marketed" GSK's products. (*Id.* at 48:13-22, 80:14-81:2, 92:3-13, 158:6-18, 255:15-256:1).

75. Christopher's career as a GSK PSR ended on May 17, 2007 when he was terminated following an internal investigation that revealed he had violated GSK's code of conduct by reporting he had made sales calls with physicians with whom he did not in fact meet face-to-face. (*Id.* at 251:25-257:17, Ex. 34).

III. **MATERIAL FACTS RELATED TO PLAINTIFF FRANK BUCHANAN**

76. Frank Buchanan ("Buchanan") began working for GSK on September 15, 2003 as a Pharmaceutical Sales Representative ("PSR"). (Buchanan Dep. at Ex. 7).

77. Buchanan sought out GSK and pursued a PSR position, submitting an online application for the job on August 18, 2003. (*Id.* at 168:11-13, Ex. 6).

78. Before applying for a job as a PSR, Buchanan worked in sales. (*Id.* at 42:23-50:12, Ex. 6).

79. Buchanan thought his prior sales experience would help him perform satisfactorily as a PSR. (*Id.* at 171:5-10).

80. When Buchanan applied for the PSR position, he understood that GSK was looking for candidates who had prior selling experience. (*Id.* at 168:18-20).

81. Buchanan understood that GSK's expectation of him as a PSR was that he would "[s]ell products to a specific customer market." (*Id.* at 170:23-171:4, Ex. 5).

#643935

1    82.    Buchanan understood that GSK's expectation of him as a PSR was that he

2          would "[d]evelop [a] local business plan to increase [GSK's] market share"

3          and would "[p]ositively impact sales in [his] territory."  (*Id.* at 170:23-171:4,

4          Ex. 5).

5    83.    Buchanan understood that GSK's expectation of him as a PSR was that he

6          would "[u]tilize customer-focused selling techniques," "[d]evelop and

7          deliver informative sales presentations based on customer needs," and

8          "[d]evelop creative sales strategies to reach hard-to-see doctors/hard-to-work

9          accounts."  (*Id.* at 170:23-171:4, Ex. 5).

10   84.    Buchanan was promoted sometime during his five-year career with GSK,

11         but his job duties remained the same.  (*Id.* at 184:5-11).

12   85.    After Buchanan was hired as a PSR, GSK sent him to a three-and-a-half-

13         week new hire training program.  (*Id.* at 179:19-21).

14   86.    Buchanan also was told during new hire training that as a PSR he was

15         expected to engage in dialogue with a prescriber about why GSK products

16         would be effective for a particular type of patient.  (*Id.* at 181:20-24).

17   87.    During training, Buchanan was told that his "customer" as a PSR was a

18         prescribing physician or someone who could influence a prescribing

19         physician.  (*Id.* at 182:9-12).

20   88.    Buchanan learned during new hire training that PSRs should "gain[] the best

21         possible commitment" from the physicians whom they visited on their sales

22         calls.  (*Id.* at 182:25-183:13).

23   89.    Buchanan took additional sales training courses during his career with GSK.

24         (*Id.* at 191:12-192:14, Ex. 9).

25   90.    For example, Buchanan was trained in the Assertive Selling Always

26         Professional ("ASAP") Selling Model, under which he was trained to gain

27         commitments from his customers to take specific action (*e.g.*, to prescribe

28         GlaxoSmithKline products to appropriate patients) by asking questions that

BRYAN CAVE LLP
TWO NORTH CENTRAL AVENUE, SUITE 2200
PHOENIX, ARIZONA 85004-4406
(602) 364-7000

#643935

-12-

BRYAN CAVE LLP
TWO NORTH CENTRAL AVENUE, SUITE 2200
PHOENIX, ARIZONA 85004-4406
(602) 364-7000

1   seek commitments to action (Curtin Decl. ¶ 12).

91.   Buchanan also received training as part of GSK's Worldwide Sales Force Excellence ("WSFE") sales initiative on the When? Why? How? ("WWH") approach to sales.  (Curtin Decl. ¶ 13).

92.   Buchanan also underwent "train the trainer" training sometime in 2006. (Buchanan Dep. at 154:21-155:18).

93.   As a regional associate trainer, Buchanan worked with newly-hired PSRs to aid their transition from GSK's new hire training to the real world of pharmaceutical sales.  (*Id.* at 125:6-127:1).

94.   Because Buchanan felt that "[a] lot of the things you're trained to do in new-hire training are not applicable in the field," he relied upon his previous sales background to adjust his own and his trainees' sales methods to fit the pharmaceutical sales industry and achieve the ultimate goal of convincing a physician to write more prescriptions for GSK products.  (*Id.* at 125:6-127:16).

95.   During his time with GSK, Buchanan received training on GSK's "Winning Practices."  (Curtin Decl. at ¶ 15).

96.   Buchanan understood that GSK's "Winning Practices" were considered the skills, knowledge, and behaviors demonstrated by GSK's most successful PSRs.  (*Id.* at 215:20-25, Ex. 14; Curtin Decl. at ¶ 16).

97.   Buchanan understood that as a PSR, his performance was to be rated with respect to each of the "Winning Practices."  (*Id.* at 216:1-5, 19-23).

98.   Buchanan received eight or more "Field Coaching Reports" that assessed his job performance as a PSR against GSK's "Winning Practices."  (*Id.* at Exs. 19-26).

99.   On Buchanan's 2006 Annual Performance and Development Plan, he described himself as a "Expert" at the winning practice of "Owning the Territory Business," because he "evaluate[d] the territory routinely[,]…

-13-

anticipate[d] trends…utilize[d] all resources to the maximum to create favorable outcome[s, and took] initiative to identify potential/actual advantages and challenges." (*Id.* at 246:3-247:7, Ex. 16).

100. On his January 17, 2008 self-assessment with respect to the "Winning Practices," Buchanan rated himself "Expert" at "analyz[ing] what is happening in the territory and understand[ing] why," meaning that he "[g]ain[ed] competitive advantage by participating [in] opportunities and challenges, interpreting the latest results for others and leading [the] team action to grow the business" and "[d]iscern[ed] the activity of the competition in the local marketplace and what the team needs to do to be effective." (*Id.* at 219:13-220:9, 220:18-221:13, Ex. 15).

101. Buchanan contends that PSRs do not "sell" pharmaceutical products because patients, not physicians, are the end-users of the products and because physicians do not purchase anything directly from PSRs on or following sales calls. (*Id.* at 113:4-114:12).

102. Buchanan has repeatedly described what he does as a PSR as "selling." (*Id.* at 113:6-9 ("Q:  Okay.  But you certainly have described what you do as selling repeatedly [sic] consistently?  A:  Within the pharmaceutical industry, absolutely."); 122:23-123:1 ("Wellbutrin XL was a drug that I had for two years.  It was exceptionally difficult to sell because formulary coverage was almost nonexistent."); 160:19-23 ("Q:  Okay.  Which of those products did you sell when you were responsible for the Northern Arizona territory?  A:  Sold Wellbutrin, Advair, Imitrex, Boniva."); 192:15-193:9 ("Q:  And you were never trained on products that you never were responsible for; correct?  A:  No.…I'd help out the Avandia guys, you know, with the clinical reprint or something of that extent…Picture, like, sitting down in Starbucks with five people and going over a clinical reprint, kind of show them how to sell it.")).

#643935

-14-

BRYAN CAVE LLP
TWO NORTH CENTRAL AVENUE, SUITE 2200
PHOENIX, ARIZONA 85004-4406
(602) 364-7000

1   103.   Buchanan also testified that he "market[ed]" GSK products. (*Id.* at 113:4-5).

2   104.   As a PSR, Buchanan knew that his objective was "to convince prescribers

3          that the benefits of GSK's products warranted them prescribing that product

4          to the appropriate patient." (*Id.* at 121:24-122:4).

5   105.   As a PSR, Buchanan's "goal was to get physicians to write more

6          prescriptions for the products [he] had in [his] portfolio." (*Id.* at 122:5-8).

7   106.   Buchanan testified that "what [he] [is] after" as a PSR is a prescription from

8          a physician for the pharmaceutical products he represents. (*Id.* at 183:14-

9          17).

10  107.   Buchanan admits that as a PSR, he made sales in the way that sales are made

11         in the pharmaceutical industry, testifying that "What they consider to be

12         sales in pharmaceutical circles is—is what—is what I said I did." (*Id.* at

13         110:24-111:15, 113:6-114:12).

14  108.   As a PSR, Buchanan examined data regarding prescription habits for the

15         physicians in his territory, then used the data to alter his message on visits to

16         physicians who had the potential to write more prescriptions and increase

17         GSK market share. (*Id.* at 256:10-257:12).

18  109.   Buchanan used data regarding physicians' prescription habits to develop his

19         own approach for targeting certain physicians to prescribe more Wellbutrin.

20         Buchanan shared his approach with the Director of Market Development in

21         his region. (*Id.* at 187:13-191:5, Ex. 8)

22  110.   On Buchanan's Field Coaching Reports, which were completed by his

23         District Sales Manager following ride-alongs, Buchanan routinely received

24         praise for his pre-call planning, including consistently having a strategy for

25         every sales call and arriving at a physician's office "ready to sell." (*Id.* at

26         271:14-25, Exs. 19-25).

27  111.   On Buchanan's 2006 Annual Performance and Development Plan, his

28         District Sales Manager wrote that one of Buchanan's strengths was that he

#643935

-15-

BRYAN CAVE LLP
TWO NORTH CENTRAL AVENUE, SUITE 2200
PHOENIX, ARIZONA 85004-4406
(602) 364-7000

1   "thinks about the business…and what can be done to grow [it];" that

2   Buchanan looked at his territory as his own small business and considered

3   how he would spend his resources to maximize return on his investment.

4   (*Id.* at 245:10-246:2, Ex. 16).

5   112.   Buchanan wrote on his October 2, 2006 Field Coaching Report that he was

6   "attacking the ped[iatrics] market" for Advair and "expect[ed] Fall Quarter

7   to be strong in this arena." (*Id.* at Ex. 19).

8   113.   On the resume he submitted to Schering-Plough after leaving GSK,

9   Buchanan described a "result" he had achieved as a PSR for GSK in the

10   following terms: "Successfully drove Wellbutrin XL through the P&T

11   committee process to gain formulary Coverage on NARBHA 2005." (*Id.* at

12   122:9-16, Ex. 2).

13   114.   Buchanan "came up with a strategy with [his] boss to get NARBHA to

14   put…Wellbutrin XL on its formulary," and considered it a "big

15   achievement" when they succeeded in having Wellbutrin added to the

16   NARBHA formulary. (*Id.* at 123:5-14).

17   115.   Buchanan chose the drug product on which to focus on a sales call with a

18   particular physician. (*Id.* at 67:2-5).

19   116.   Because there were "a lot of variables that go into" each sales call, Buchanan

20   changed his opening question depending on the physician to whom he was

21   speaking and the product about which he was talking. (*Id.* at 68:1-8).

22   117.   Buchanan formulated his own opening questions for his sales calls, based on

23   his experience and, sometimes, based on feedback from his supervisor. (*Id.*

24   at 69:3-70:4).

25   118.   According to his District Sales Manager, Buchanan began his sales calls by

26   asking questions, "probing to find a need or an opening that [a GSK

27   pharmaceutical] would satisfy." (*Id.* at Ex. 21).

28

#643935

BRYAN CAVE LLP
TWO NORTH CENTRAL AVENUE, SUITE 2200
PHOENIX, ARIZONA 85004-4406
(602) 364-7000

119. Although he used the same resources and sales tools throughout the day on his sales calls, there was no "one size fits all" approach. (*Id.* at 226:8-16).

120. Buchanan had to be "quick on [his] feet" and "flexible in [his] approach" so that he was "prepared for potential objections." (*Id.* at 227:13-18).

121. Even though GSK provided him with core messages about its pharmaceuticals to share on his sales calls, Buchanan understood that to be effective as a PSR, you had to know what information to share and when in order to respond to a physician's objections. (*Id.* at 227:13-228:8).

122. Buchanan received core messages about pharmaceutical products from GSK, but he reorganized those messages into more "appropriate dialogue" for sales calls with physicians. Buchanan shared his reorganized messages with other PSRs. (*Id.* at 254:1-255:17, Ex. 18).

123. Buchanan used GSK clinical aids on sales calls, but said that "the sales aid has five pages on it, each dealing with a different topic; so you try and pick a part of that that would be relevant for the doctor." (*Id.* at 201:7-10).

124. When Buchanan was on a sales call and met with a doctor, he used clinical studies to discuss the clinical benefits of GSK products. (*Id.* at 257:13-258:6).

125. Buchanan had discretion to determine whether to and how many samples to leave with the physicians in his territory. (*Id.* at 267:5-268:22).

126. Buchanan knew he was supposed to ask for a commitment at the end of every sales call. (*Id.* at 233:13-234:23).

127. Buchanan's October 2, 2006 Field Coaching Report states that Buchanan "effectively gain[ed]a firm commitment from customers" and "was professionally assertive at obtaining a firm yes or no." (*Id.* at Ex. 19).

128. GSK did not provide Buchanan with an office out of which he could work. (*Id.* at 258:7-14).

#643935

BRYAN CAVE LLP
TWO NORTH CENTRAL AVENUE, SUITE 2200
PHOENIX, ARIZONA 85004-4406
(602) 364-7000

129. Buchanan spent the majority of his time in the field making sales calls, arriving in his territory between 8:30 and 9:00 most mornings and leaving the field between 4:00 and 5:00 in the evenings. (*Id.* at 261:3-24).

130. Buchanan's initial base salary was $49,600 per year. (*Id.* at 178:10-17, Ex. 7).

131. At the time he left GSK, Buchanan's base salary was $56,800 per year. (*Id.* at 105:8-12).

132. In addition to his base salary, a significant portion of Buchanan's total compensation was incentive compensation, which was based on the increase in market share and/or sales volume in his territory of the drugs for which he was responsible. (*Id.* at 46:3-7; Pellegrino Decl. at ¶ 11, 13).

133. Buchanan's incentive compensation target was $21,000 per year, but it was uncapped, meaning Buchanan had unlimited earning potential. (Buchanan Dep. at 132:4-10, 173:3-8, 178:10-19, Ex. 7).

134. Having unlimited earning potential was important to Buchanan and it is part of the reason he was attracted to the PSR position with GSK. (*Id.* at 173:9-16).

135. Buchanan understood that there was a relationship between how hard he worked as a PSR and his incentive compensation. (*Id.* at 174:21-175:2).

136. Buchanan was very motivated by his incentive compensation. (*Id.* at 195:8-11).

137. Because his incentive compensation as a PSR was weighted differently for each of the drugs he represented, Buchanan tailored his sales presentations whenever possible to focus first on the drugs that were more heavily weighted. (*Id.* at 205:23-207:10).

138. In 2004, Buchanan received $19,232 in incentive compensation, which was 27% of his $70,740 in gross pay. (Pellegrino Decl. at ¶ 13).

#643935

BRYAN CAVE LLP
TWO NORTH CENTRAL AVENUE, SUITE 2200
PHOENIX, ARIZONA 85004-4406
(602) 364-7000

139. In 2005, he received $23,743 in incentive compensation, which was 32% of his $74,358 in gross pay. (*Id.*).

140. In 2006, Buchanan received $32,519 in incentive pay, which was 38% of his $84,932 in gross pay. (*Id.*).

141. In 2007, Buchanan received $19,957 in incentive compensation, which was 26% of his $75,776 in gross pay. (*Id.*).

142. Buchanan's District Sales Manager sometimes did "ride-alongs," accompanying him on his field visits. (Buchanan Dep. at 271:8-13).

143. On the ride-alongs, Buchanan's District Sales Manager evaluated him and gave him feedback on his sales calls. (*Id.*).

144. Buchanan directly communicated with his District Sales Manager via telephone "maybe a couple times per week," in addition to exchanging voice mails at other times during the week. (*Id.* at 269:23-270:18).

145. Buchanan did not have direct, human supervision during the course of his work day. No one was "literally watching" what he did. (*Id.* at 270:19-271:6).

146. Although Buchanan did not add any physicians to GSK's list of prescriber customers, he was aware that GSK had a formal process through which he as a PSR could submit physicians' names to be added to the prescriber list. (*Id.* at 304:5-305:5).

147. Buchanan's career as a GSK PSR ended when he left GSK in early 2008 to work as a PSR for another pharmaceutical company, Schering-Plough. (*Id.* at 55:23-56:7, 67:9-11).

148. On the resume he submitted to Schering-Plough, Buchanan described his skills as a PSR as including "Managing, developing, and planning time and territory for optimum productivity and results." (*Id.* at 116:12-24, Ex. 2).

149. On the resume he submitted to Schering-Plough, Buchanan described his skills as a PSR as including "Proven ability to develop and execute

#643935

BRYAN CAVE LLP
TWO NORTH CENTRAL AVENUE, SUITE 2200
PHOENIX, ARIZONA 85004-4406
(602) 364-7000

1    marketing programs that contribute to business growth." (*Id.* at 116:25-

2    117:3, Ex. 2), meaning "increased sales of GSK products." (*Id.* at 117:4-8).

150.   Buchanan also states on the resume he submitted to Schering-Plough that as

      a PSR for GSK, he had "[d]evelop[ed] and manage[d] [a] sales territory with

      responsibility for marketing and selling respiratory product portfolio to

      allergists, pulmonologists, pediatricians and family medicine physicians in

      the Phoenix area." (*Id.* at 117:10-118:4, Ex. 2).

151.   On the resume he submitted to Schering-Plough, Buchanan also describes

      his duties as a GSK to include "[c]onduct[ing] sales presentations in the

      physician office setting, promotional programs and therapeutic

      conventions." (*Id.* at 119:12-20, Ex. 2).

152.   Buchanan's current duties as a PSR for Schering-Plough are "very similar"

      to the duties he performed as a PSR for GSK. (*Id.* at 58:9-20).

153.   Buchanan's compensation as a PSR for Schering-Plough is structured the

      same way as his compensation as a PSR for GSK—he earns a base salary

      plus he is eligible to earn $21,000 in incentive compensation. (*Id.* at 150:20-

      151:25).

154.   Even though the duties he performs and the hours he works as a PSR for

      Schering-Plough are almost identical to the duties and hours he worked as a

      GSK PSR, Buchanan does not believe he is entitled to overtime pay as a

      PSR for Schering-Plough because he earns a higher base salary there and he

      feels that the higher base salary is more "fair" than what he was earning at

      GSK. (*Id.* at 146:12-22, 149:6-19).

/ / /

/ / /

/ / /

/ / /

/ / /

#643935

-20-

1    RESPECTFULLY SUBMITTED this 22nd day of May, 2009.

2                            PAUL, HASTINGS, JANOFSKY & WALKER

3                            LLP

4

5                            By: s/Barbara L. Johnson

6                                 Barbara L. Johnson
                                  Donna D. Melby
7                                 Holly R. Lake
                                  515 South Flower Street
8                                 Twenty-Fifth Floor
                                  Los Angeles, California  90071-2228
9                                 Telephone:  (213) 683-6000
                                  Fax:  (213) 627-0705

10                           Jay A. Zweig
11                           BRYAN CAVE LLP
                             Two North Central Avenue, Suite 2200
12                           Phoenix, Arizona  85004-4406
                             Telephone:  (602) 364-7300
13                           Fax:  (602) 716-8300

14                           Attorneys for Defendant

15                      **CERTIFICATE OF SERVICE**

16        I certify that on May 22, 2009, I electronically transmitted the attached document

17   to the Clerk's Office using the CM/ECF system for filing and transmittal of a Notice of

18   Electronic Filing to the following CM/ECF registrants:

19   Michael R. Pruitt
     Christine Crockett
20   Otto S. Shill
     JACKSON WHITE P.C.
21   40 North Center, Suite 200
     Mesa, Arizona  85201
22   mpruitt@jacksonwhitelaw.com
     ccrockett@jacksonwhitelaw.com
23   oshill@jacksonwhitelaw.com
     Attorneys for Plaintiffs

24

25

26   s/Jay A. Zweig

27

28

#643935

-21-

*Left margin (vertical):* BRYAN CAVE LLP / TWO NORTH CENTRAL AVENUE, SUITE 2200 / PHOENIX, ARIZONA 85004-4406 / (602) 364-7000