# INDEX OF EXHIBITS

## TO

## STATEMENT OF MATERIAL FACTS IN SUPPORT OF DEFENDANT SMITHKLINE BEECHAM CORPORATION, d/b/a GLAXOSMITHKLINE, PLC'S MOTION FOR SUMMARY JUDGMENT

(Michael Shane Christopher, et al. v. SmithKline Beecham Corporation, d/b/a
GlaxoSmithKline, Case No. CV 08-01498-PHX-FJM)


Exhibit A.          Declaration of Bettina Stanger

Exhibit B           Michael Shane Christopher April 22, 2009 Deposition Excerpts
                    and Exhibits thereto (Part 1 of 3)

## EXHIBIT A
### (Declaration of Bettina Stanger)

## TO

## STATEMENT OF MATERIAL FACTS IN SUPPORT OF DEFENDANT SMITHKLINE BEECHAM CORPORATION, d/b/a GLAXOSMITHKLINE, PLC'S MOTION FOR SUMMARY JUDGMENT

(Michael Shane Christopher, et al. v. SmithKline Beecham Corporation, d/b/a GlaxoSmithKline, Case No. CV 08-01498-PHX-FJM)

1  BARBARA L. JOHNSON (admitted in pro hac)
   barbarajohnson@paulhastings.com
2  DONNA D. MELBY (admitted in pro hac)
   donnamelby@paulhastings.com
3  HOLLY R. LAKE (admitted in pro hac)
   hollylake@paulhastings.com
4  PAUL, HASTINGS, JANOFSKY & WALKER LLP
   515 South Flower Street
5  Twenty-Fifth Floor
   Los Angeles, CA  90071-2228
6  Telephone:  (213) 683-6000
   Facsimile:  (213) 627-0705
7
   JAY A. ZWEIG
8  jay.zweig@byrancave.com
   BRYAN CAVE LLP
9  One Renaissance Square
   Two North Central Ave., Suite 2200
10 Phoenix, AZ 85004-4406
   Telephone:  (602) 364-7300
11 Facsimile:  (602) 716-8300

12 Attorneys for Defendant SmithKline
   Beecham Corporation, d/b/a GlaxoSmithKline
13

14            IN THE UNITED STATES DISTRICT COURT

15              FOR THE DISTRICT OF ARIZONA

16

17 Michael Shane Christopher, filing          No.  CV08-01498-PHX-FJM
   individually and on behalf of all others
18 similarly situated; and Frank Buchanan,
   filing individually and on behalf of all
19 others similarly situated;
                                              **DECLARATION OF BETTINA**
20        Plaintiffs,                          **STANGER**

21 vs.

22 SmithKline Beecham Corporation,
   d/b/a GlaxoSmithKline,
23
          Defendant.
24

25

26        I, BETTINA STANGER, hereby declare as follows:

27        1.    I currently am employed by SmithKline Beecham Corporation d/b/a

28 GlaxoSmithKline as a Compliance Manager for Policies and Education, and I have

1   held this position since September 1, 2008. I am responsible for management,
2   development, and training in connection with commercial practices policies
3   applicable to U.S. Pharma employees, including sales representatives.

4       2.      I have worked in positions involving Compliance since April 2000,
5   and I have been employed by GlaxoSmithKline or one of its predecessor companies
6   since March 1996.

7       3.      I have personal knowledge of the facts set forth in this Declaration,
8   and, if called and sworn as a witness, I could and would testify as to their accuracy.

9       4.      I make this Declaration entirely of my own free will and choice. No
10  promises of benefits or threats have been made to me to persuade me to sign it.

11      5.      I am familiar with legal compliance issues that arise in connection with
12  the activities of GlaxoSmithKline sales representatives.

13      6.      GlaxoSmithKline's principal production activity is the manufacture of
14  pharmaceutical products. The pharmaceutical industry is heavily-regulated by the
15  federal government, and GlaxoSmithKline must sell its products in a manner that
16  complies with elaborate federal regulations. As a direct result of this regulatory
17  framework, GlaxoSmithKline's sales representatives must sell GlaxoSmithKline
18  products in a manner different from that in which salespeople in non-regulated
19  industries sell their products. Specifically, GlaxoSmithKline sales representatives
20  cannot sell products directly to the end-users of those products, and, instead, must
21  educate and strive to secure commitments from physicians to prescribe those
22  products to appropriate patient end-users, who, in turn, can purchase those products
23  from pharmacies only after obtaining such prescriptions.

24      7.      GlaxoSmithKline and its employees are subject to federal regulation
25  under the Federal Food, Drug, and Cosmetic Act ("FDCA"), the Prescription Drug
26  Marketing Act ("PDMA"), the Anti-Kickback Statute ("AKS"), the Health
27  Insurance Portability and Accountability Act ("HIPAA"), and other regulations and
28  federal laws.

-2-

1      8.      GlaxoSmithKline has adopted policies governing the activities of sales
2    representatives that incorporate these regulatory restrictions on their activities.

3      9.      For example, by law, patients cannot purchase prescription drugs
4    without first obtaining a prescription from a healthcare professional who is licensed
5    under state law to prescribe prescription products.  This means that sales
6    representatives cannot sell GlaxoSmithKline products directly to patient-
7    consumers, and GlaxoSmithKline prohibits sales representatives from participating
8    in any such activities, as well as from even discussing with or demonstrating to
9    patient-consumers how to use GSK products or devices.

10     10.     Similarly, GlaxoSmithKline policies incorporate regulatory restrictions
11   that: (i) permit sales representatives to discuss with healthcare providers only FDA-
12   approved "on label" uses of GlaxoSmithKline products and (ii) require sales
13   representatives to give a balanced presentation of the benefits and risks associated
14   with the products that they are selling.   To ensure compliance, GlaxoSmithKline
15   permits sales representatives to use only those written materials that were created
16   and/or approved by GlaxoSmithKline.

17     11.     While GlaxoSmithKline's policies that govern the activities of sales
18   representatives provide guidance, instruction, and rules that are designed to ensure
19   that sales representatives do not engage in activities that are inconsistent with the
20   regulatory requirements, it is not possible to address every situation that a sales
21   representative may encounter while engaged in sales activities; accordingly, it is
22   critical that sales representatives use their own discretion and judgment in
23   determining whether their conduct is appropriate and consistent with applicable
24   law, industry standards, and GlaxoSmithKline policies, as well as in determining
25   how best to achieve their sales goals in a manner consistent with their legal
26   obligations.

27
28

1      I have read this Declaration, and I declare under penalty of perjury under the

2  laws of the United States that the foregoing is true and correct.

3      EXECUTED this _i 4_ day of May, 2009.

4

5

6                                    Bettina Stanger

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

-4-

# EXHIBIT B
### (Excerpts of Michael Shane Christopher's April 22, 2009 Deposition)

## TO

## STATEMENT OF MATERIAL FACTS IN SUPPORT OF DEFENDANT SMITHKLINE BEECHAM CORPORATION, d/b/a GLAXOSMITHKLINE, PLC'S MOTION FOR SUMMARY JUDGMENT

(Michael Shane Christopher, et al. v. SmithKline Beecham Corporation, d/b/a GlaxoSmithKline, Case No. CV 08-01498-PHX-FJM)

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

Michael Shane Christopher,            )
filing individually and on            )
behalf of others similarly            )
situated; and Frank Buchanan,         )
filing individually and on            )
behalf of all others                  )
similarly situated;                   )
                                      )
            Plaintiffs,               )
                                      )
versus                                )    No. CV-01498-FJM
                                      )
SmithKline Beecham Corporation,       )
d/b/a GlaxoSmithKline;                )
                                      )
            Defendant.                )
_____)


DEPOSITION OF:  MICHAEL SHANE CHRISTOPHER
TAKEN ON:       April 22, 2009




        28985              ALTHEA L. MILLER
                           CSR No. 3353, RPR

1    I did -- performed, medications administered,

2    stabilization, blood pressure, heart rate,

3    respiratory rate, those types of reports.

4          (The document referred to was marked as

5          Christopher Exhibit 3 by the Reporter.)

6    BY MS. JOHNSON:

7      Q   Would you take a look at Christopher

8    Exhibit 4.

9      A  3.

10     Q  3. I'm sorry.

11         Have you had -- had an opportunity to look

12   at Christopher Exhibit 3?

13     A  Yes.

14     Q   Okay.  Before I ask you some questions

15   about that particular exhibit, do you recall how you

16   went about applying for the position at GSK?  Was it

17   online?  Or did you submit a hard-copy application?

18   Do you recall?

19     A   I believe at the time, if I can recall, I

20   believe I looked online.

21         There was a recruiting event in Columbus,

22   Ohio, that I went to on, like, a Monday; and then

23   there was also a recruiting event in Lexington,

24   which is the city I was living in, on another day

25   later in the week.

Christopher, Michael  4/22/2009  9:17:00 AM

1           I went to both.  And I applied in person

2    and spoke with a recruiter in person.

3           And I -- I believe I -- I submitted an

4    online application; and then I also had to --

5    apparently -- I mean, obviously, filled out a --

6    from an Exhibit 1 -- I filled out a paper

7    application and submitted that as well.

8        Q   Do you recall -- did you meet with one

9    recruiter or two recruiters?  You mentioned two job

10   fairs that you went to?

11       A   Ironically, it was the same recruiter,

12   Jeff -- Jeff Hoch.

13       Q   Okay.  And do you recall what Mr. Hoch told

14   you about the position that was available?

15       A   Initially, he told me I didn't have any

16   experience.

17       Q   Okay.  Anything else other than that you

18   didn't have any -- what did he tell you about the

19   job, though?

20       A   Pretty much I sat down; he told me I didn't

21   have any experience, I needed to go to -- sell copy

22   machines or go to work for Enterprise and rent cars.

23   That was -- that was the biggest thing that stuck

24   out to me.

25       Q   Do you recall why -- did he explain why he

Christopher, Michael  4/22/2009  9:17:00 AM

1     thought those experiences would be beneficial to you

2     in enhancing your probability of getting a job?

3         A   I re- -- I slightly recall I think he

4     mentioned that the training that those companies

5     provided was very integral and -- and in depth and

6     could benefit me as far as the way I would promote

7     and market medications for GSK.

8         Q   Did you ever see a copy of a job

9     description before you went to work at GSK?

10        A   No.

11        Q   Anything else that you can recall that

12    Mr. Hoch told you about the position of

13    pharmaceutical sales rep that you got at GSK?

14        A   I do not recall.

15        Q   Okay.  So you submitted your application,

16    even though Mr. Hoch was somewhat skeptical, it

17    sounds like, of your --

18        A   Well, I submitted online prior to this

19    event.  I went to this event.

20        Q   I see.

21        A   Met with him.  He gave me this information.

22            And I had driven a couple miles north to --

23    to go to this open house, and then I also went to

24    the open house recruiting event later in the week

25    and ironically met with him again.

Christopher, Michael 4/22/2009 9:17:00 AM

1    Exhibit 3.

2        Your title was pharma- -- you were told

3    that your title would be pharmaceutical sales rep;

4    correct?

5        A  Correct.

6        Q  And that your job grade would be an S10?

7        A  Correct.

8        Q  You were given a territory number in

9    Lexington; correct?

10       A  Correct.

11       Q  And that you would be reporting to

12   Jeff Nash, the district sales manager?

13       A  Correct.

14       Q  The department is identified as field

15   sales; correct?

16       A  Correct.

17       Q  And your start date was to be March 31st,

18   2003; correct?

19       A  Correct.

20       Q  And your base salary was to be $38,500

21   annualized and payable biweekly; correct?

22       A  Correct.

23       Q  If you go to page 2, toward the bottom of

24   page 2, there is a description of sales training.

25       Do you see that?

1     A  I do.

2     Q  Was it your understanding that, before

3     assuming responsibilities as a pharmaceutical sales

4     rep, you were to take sales training?

5     A  Was it my understanding?

6     Q  Yes.

7     A  Yes.

8     Q  And that part of the sales training

9     involved home study; correct?

10    A  Yes.

11    Q  And part of the sales training involved

12    in-person training?

13    A  It was classified as in-house training,

14    yes.

15    Q  In-house training.

16       And that your employment was going to be

17    contingent on you passing this training; right?

18    A  Correct.

19    Q  Okay.  I'd like to ask you some questions

20    about the training that -- that you received.

21       Can you describe for us the -- generally

22    the type of training that you received.

23    A  For home study or for in-house training?

24    Q  Well, let's start with home study.

25    A  Home study was approximately four weeks of

1   learning materials.  I received several boxes of

2   folders and books, CDs, DVDs of materials of the

3   particular products that I were [verbatim] to

4   promote and market at that time.

5       Q   Okay.  And did you have tests in connection

6   with home study?

7       A   There were.

8       Q   And describe the in-house training that you

9   received.

10      A   In-house training consisted of flying from

11  Lexington to Philadelphia for approximately

12  three and a half weeks.

13          There were -- we were not allowed to come

14  home on the weekend due to late flights and possibly

15  being absent for a day or two, trying to get back to

16  Philadelphia; so we were there for the entire time

17  in a hotel that was adjacent to the Franklin Plaza,

18  Philadelphia office for GSK.

19          Within that training, it was, I think, for

20  my particular training class, there were roughly 400

21  trainees that went through different phases of

22  training for different products.

23          We covered marketing material, promotional

24  material, sales aids, clinical reprints, the

25  standardized-type training where everyone got the

1    same information, that sort of thing.

2         We covered computer training as far as how

3    to -- to input data for physicians that we were

4    regulated on to call -- expense reports, routing.

5         I'm -- I'm sure there were other modules

6    or -- or classes that were done, and I just -- I

7    don't -- I don't recall right now.

8    Q   Did you receive any sales training?

9    A   I can't recall -- I can't recall if they

10   classified it as "sales training."

11   Q   Okay.

12   A   It was just -- it was -- it was product

13   training on particular products that we were

14   responsible for.

15        (The document referred to was marked as

16        Defendants' Exhibit 4 by the Reporter.)

17        (The document referred to was marked as

18        Defendants' Exhibit 5 by the Reporter.)

19   BY MS. JOHNSON:

20   Q   You've been handed what has been marked as

21   Christopher Exhibit 4 and Christopher Exhibit 5.

22        Do you recognize those?

23   A   If I could have just a minute.

24   Q   Sure.

25   ///

Christopher, Michael  4/22/2009 9:17:00 AM

1          (The document referred to was marked as

2          Christopher Exhibit 7 by the Reporter.)

3      BY MS. JOHNSON:

4          Q   Do you recall ever seeing a copy of

5      Exhibit 7, which is a job description for a

6      "Pharmaceutical Sales Representative Grade: S10"?

7          A   I do not recall if I did or didn't.  I may

8      or may -- may not have.

9          Q   Okay.  Was it your understanding that the

10     purpose of a pharmaceutical sales representative was

11     to promote all GSK pharmaceutical products to

12     customers within territory, using established

13     protocol data and approved promotion materials to

14     meet or exceed established sales goals and

15     objectives?

16         A   You asked me if I was aware of that for the

17     purpose?

18         Q   Or is -- was that your purp- -- one of your

19     purposes as a pharmaceutical sales representative?

20         A   Yes.

21         Q   And was your -- a second purpose to work in

22     conjunction -- was a second purpose to work in

23     conjunction with other representatives in developing

24     strategies to increase sales of GSK pharmaceutical

25     products and territory?

Christopher, Michael  4/22/2009  9:17:00 AM

1    A  I would say we increased knowledge of GSK

2   pharmaceutical products.

3    Q  Okay.  Is it true that you were

4   incentivized through incentive compensation based on

5   increases in sales in your territory?

6    A  We were compensated on increase in the

7   market share.

8    Q  And by increase in market share, there

9   would be increases in sales; correct?

10    A  I don't know how the formulation was

11   calculated, but it was based on the market share

12   percentage of the products.

13    Q  So is it your testimony here today that you

14   don't believe that there's any relationship between

15   increase in market share and increase in sales of

16   GSK products in your territory?

17    A  How they formulated that, I do not know.

18    Q  No.  I'm not asking you about incentive

19   comp now.  I'm asking you a more general question.

20      Is it your testimony here today that there

21   is no relationship between an increase in sales in

22   GSK products and an increase in market share?

23    A  There could be, yes.

24    Q  That there could be?

25    A  There could be a relation.

1    our geography and then there were formularies that

2    those physicians actually had in their practice --

3    for instance, a Blue Cross, Blue Shield insurance or

4    Cigna insurance -- so we had to try to extrapolate

5    the data that was given to us to list under -- under

6    those physicians, yes.

7        Q   Okay.  Under "Key Responsibilities" --

8        A   Which exhibit?

9        Q   I think it's 8.  The last exhibit.

10       A   I don't have 8 yet.

11       Q   Then it must be 7.  I guess I'll start

12   numbering them.

13           Okay.  No. 7.  Under the job description

14   for pharmaceutical sales representatives, do you see

15   the section called "Key Responsibilities"?

16       A   Yes.

17       Q   The first key responsibility under job

18   description is to "Sell products to specific

19   customer market according to the business plan."

20           Was that one of your responsibilities?

21       A   I wouldn't classify it as a sell.  I would

22   say "promote" or "market."

23       Q   Okay.  Was one of your responsibilities to

24   "Develop local business plan to increase market

25   share by outlining tactics, activities and

Christopher, Michael 4/22/2009 9:17:00 AM

1    resources"?

2        A   Yes.

3        Q   Was one of your key responsibilities to

4    "Demonstrate a thorough knowledge of GSK

5    pharmaceutical products, competitor products and

6    product objectives"?

7        A   Yes.

8        Q   Was one of your key responsibilities to

9    "Utilize customer-focused selling techniques,

10   continually assessing the knowledge of the customer,

11   and strategize to maintain high customer intimacy

12   and customer knowledge of GSK products"?

13       A   Yes.

14       Q   No. 5, was one of your key responsibilities

15   to "Maintain current approved protocol and

16   promotional materials to be included in sales

17   presentations"?

18       A   Yes.

19       Q   And was one of your key responsibilities to

20   "Actively seek and display knowledge of key

21   customers in territory"?

22       A   Yes.

23       Q   Was one of your responsibilities to dev- --

24   "Develop and deliver informative sales presentations

25   based on customer needs"?

1       Q   We had talked earlier about the training

2    that you received when you went to work at GSK.

3    Does Exhibit 8 describe generally the type of

4    training that you received as a new rep?

5       A   Yes.

6       Q   Approximately how long did your training

7    last?

8       A   Again, I believe the -- the home study was

9    four weeks and in-house training in Philadelphia was

10   three and a half weeks.

11        (The document referred to was marked as

12        Christopher Exhibit 9 by the Reporter.)

13   BY MS. JOHNSON:

14       Q   Are you familiar with the term "eForce

15   modules"?

16       A   Yes.

17       Q   What are eForce modules?

18       A   I think it's the avenue that GSK used as

19   online assessments and continuing education.

20       Q   And did you avail yourself of eForce

21   training while you were at GSK?

22       A   Yes.

23       Q   And, in fact, you took a number of eForce

24   modules; correct?

25       A   Yes.

1          MS. JOHNSON:  And I think we're on

2     Exhibit 9.

3          THE REPORTER:  Yes.

4     BY MS. JOHNSON:

5          Q   Okay.  If you go to page 3 of Exhibit 9,

6     take a look at page 3 and 4.

7          Do pages 3 and 4 of Exhibit 9 contain the

8     eForce modules that you took online while you were

9     with GSK?

10         And take a minute to look over those.

11         Do pages 3 and 4 of Exhibit 9 contain the

12    eForce modules that you took online while you were

13    with GSK?

14         A   It looks to be an account of the Force --

15    of the eForce modules that I did take, yes.

16         (The document referred to was marked as

17         Christopher Exhibit 10 by the Reporter.)

18    BY MS. JOHNSON:

19         Q   Take a look at Christopher Exhibit 10.

20         Is Christopher Exhibit 10 a copy of an

21    email that you sent to certain people within GSK,

22    dated May 30th, 2003, subject "The Beginning"?

23         A   Can you repeat your question.  I'm sorry.

24         Q   Is Christopher Exhibit 10 a copy of an

25    email that you sent to certain people within GSK,

1   dated May 30th, 2003, with the subject "The

2   Beginning"?

3        A   Yes.

4        Q      "Hello, I just wanted to

5           say 'Thank You' to each and every-" --

6           "each and everyone of you for the effort

7           you have made to make me feel like a

8           HUGE part of the TEAM.  I feel as if I

9           have been working with you for years,

10          and that feeling is wonderful.  I have

11          ... enjoyed my very 1st week working

12          with 'The Greatest Sales Team in

13          America.'  I have been waiting anxiously

14          for this week and now that it is here, I

15          expect to make a positive impact on our

16          goal, our market share, our strategies,

17          and our overall focus .... Making

18          Doctors feel confident in prescribing

19          GSK's products.  Enough of the soft

20          hearted stuff.  I hope everyone has a

21          wonderful weekend and I will see ya next

22          week.  MSC."

23          Did I read that correctly?

24     A   Correct.

25          MR. PRUITT:  I just want to make a

Christopher, Michael  4/22/2009  9:17:00 AM

1      A   Yes.

2      Q   You said there -- there were approximately

3   6,000 sales reps -- GSK sales representatives at the

4   Avandaryl meeting?

5      A   Yes.

6      Q   How long did the meeting last?

7      A   Four days with a travel day on Sunday, I

8   believe.

9      Q   So five days including the travel days or

10   four days including the travel days?

11      A   I believe we traveled to Vegas on Sunday

12   evening, began the meeting on Monday morning, and

13   then traveled home on Thursday afternoon.

14        I believe that's how it worked.

15      Q   Was it your understanding that all GSK

16   sales reps attended the Avandaryl meeting?

17      A   No.  Just those that had responsibilities

18   for promoting and marketing Avandaryl.

19      Q   Okay.

20        THE VIDEOGRAPHER:  Mr. Christopher, your

21   microphone is rubbing on your jacket there.

22        THE WITNESS:  Sorry.

23   BY MS. JOHNSON:

24      Q   In 2005, you were -- you received a

25   promotion; correct?

1   A   That sounds right.

2   Q   And you were promoted to the position of

3   pharmaceutical senior sales representative; correct?

4   A   That sounds accurate.

5   Q   Mr. Nash continued to serve as your

6   district sales manager; correct?

7   A   Correct.

8   Q   And Mr. Holland remained your regional

9   vice president; correct?

10   A   Correct.

11   Q   Let me just step back for a minute.  I'm

12   going to ask you a few questions I didn't ask you at

13   the beginning.

14        Are you married?

15   A   I am.

16   Q   What is your wife's name?

17   A   Kammi Christopher.

18   Q   How long have you been married?

19   A   It will be two years May 31st.

20   Q   Do you have any children?

21   A   I do.

22   Q   How old are your children?

23   A   3 and 6.

24   Q   Were you married previously?

25   A   Yes.

Christopher, Michael  4/22/2009  9:17:00 AM

1      Q   And what was your wife's name?

2      A   My ex-wife's name is Tracy Christopher or

3    Tracy Hisle Christopher.

4      Q   Okay.  Did your job duties change after you

5    became a pharmaceutical senior sales representative?

6      A   If I recall, not.  No.

7           MS. JOHNSON:  Okay.  Let's go off the

8    record a while and take a short break.  We're going

9    to take a 10-minute break.

10          MR. PRUITT:  Okay.

11          THE VIDEOGRAPHER:  This concludes Tape 1 of

12   the deposition of Michael Shane Christopher.

13          We're off the record at 10:44.

14          (A brief recess was taken.)

15          THE VIDEOGRAPHER:  This is Tape 2 in the

16   deposition of Michael Shane Christopher.

17          We're on the record at 11:04.

18   BY MS. JOHNSON:

19      Q   Mr. Christopher, before the break, I had

20   asked you some questions about the training that you

21   received at GSK.

22          And I recall that you described the new rep

23   training that you received.

24          Do you recall that?

25      A   Yes.

Christopher, Michael  4/22/2009  9:17:00 AM

1    approval or go-ahead.

2         I then sent out an email, I believe, to --

3    to Joe Golson, who at that time was the district

4    sales manager for the particular position that was

5    open in the Phoenix Metro area.

6         I -- I think I had to apply online.  I had

7    to meet with Joe Golson for an interview.  It wasn't

8    a -- it wasn't a given just because I worked for

9    GSK.  I had to interview with him.

10        So we sat down for an interview.  I flew

11   home in [verbatim] Kentucky.  I think I received a

12   phone call or an email or -- or some sort of -- of

13   communication to offer me the -- the position and

14   approve the transfer.

15        So I think there may have been some contact

16   between Jeff Nash, Joe Golson -- obviously, there's

17   some HR representatives involved with the

18   transfer -- and then transferred here.

19   Q   Did GSK pay for your transfer?

20   A   No.

21   Q   So you paid your relocation expenses?

22   A   All of them.

23   Q   Okay.  Did you ask them to pay?

24   A   Yes.

25   Q   Did you ask Mr. Nash or Mr. Golson?

Christopher, Michael  4/22/2009  9:17:00 AM

1    A   Both.

2        Q   Did they give you a reason for why they

3    didn't pay?

4        A   Lateral transfer, and it was a request of

5    myself as opposed to a promotion or -- or request

6    from GSK.

7        Q   Okay.  Are pages 1 and 2 of Exhibit 11

8    different documents or part of the same?

9        A   They are -- they're different documents,

10   but they're still my resume, just formatted a little

11   different.

12       Q   And you had described earlier the training

13   that you received when you -- when you moved.

14           And could you just -- I'd like to make sure

15   that we have that clear in terms of the training you

16   received when you moved.

17           You had training on different products;

18   correct?

19       A   Correct.

20       Q   Go ahead.

21       A   Initial training, I learned a group of

22   products, and I promoted those products in Lexington

23   for -- for Philadelphia Pharma.

24           When I requested the transfer and got it

25   approved, I moved here and picked up a different

1    group of products to promote and market to obviously

2    the Phoenix market.

3        So at that point I went through -- and I

4    can't recall how many weeks of home study for those

5    products, but I did home study for those products as

6    well as go to RTP --

7       Q  Okay.

8       A  -- in North Carolina.

9       Q  So when you went to RTP in North Carolina,

10    did you go through similar training that you had

11    received when you had your new-hire training when

12    you were working in Kentucky?

13       A  It was similar in the fact that it was

14    obviously a standardized training with GSK-approved

15    selling messages, methodologies, promotional

16    materials, clinical reprints specific to those new

17    products that I picked up at that time.

18       Q  Okay.

19       A  So I guess, to answer your question, yes,

20    the -- the training was similar but different

21    because of -- each product has different clinical

22    reprints or different messages to deliver to a

23    physician.

24       Does that answer?

25       Q  I think so, but it's more than just

Christopher, Michael  4/22/2009  9:17:00 AM

1    clinical reprints and messages.  I mean, you had --

2        A   Promotional materials.

3        Q   Let me just finish.  That's okay.

4            It's more than just clinical reprint and

5    messages.  You had to learn additional information

6    about new products apart from just and clinical

7    reprint; correct?

8        A   I had to learn disease states, yes, for --

9    the products that I promoted.

10           For instance, Boniva was for osteoporosis;

11   so I had to learn the disease state for

12   osteoporosis.

13       Q   Okay.  Could you go back to Exhibit 9.

14           Exhibit 9 is a -- that list of eForce

15   modules that we discussed.

16       A   Uh-huh.

17       Q   If you go to page 3 of Exhibit 9, the one

18   with the titles, do you recall -- there's -- there's

19   an indication there that you took a class called

20   "Intro to Winning Practices for Sales Reps."

21           Do you see that about midway the page?

22       A   Yes.

23       Q   What, if you recall, was "winning

24   practices" about?

25       A   I think I recall it was -- it was steps in

1    order to deliver our assigned messages for each

2    product to a physician.

3        Q   What do you mean by the "steps"?

4        A   Categories of -- of an opening to a

5    dialogue to a physician.

6            And I -- and I can't recall each step of

7    that process; but I believe that, to my

8    recollection -- recollection -- recollection is the

9    method of delivering those -- those key messages.

10           (The document referred to was marked as

11           Christopher Exhibit 12 by the Reporter.)

12   BY MS. JOHNSON:

13       Q   Take a look at Exhibit No. 12.

14       MR. PRUITT:  Do you have a copy for me?

15       MS. JOHNSON:  Oh, sure.

16       MR. PRUITT:  Thanks.

17   BY MS. JOHNSON:

18       Q   Are you familiar with Exhibit 12?

19       A   Yes.

20       Q   Is the first page of Exhibit 12 an email,

21   your cover email, to Mr. Golson, wherein you

22   attach -- you indicate that you've attached your RDP

23   application?

24       A   Yes.

25       Q   And does RDP stand for Regional Development

Christopher, Michael  4/22/2009  9:17:00 AM

1    that had to be prescribed by a physician; correct?

2        A   Correct.

3        Q   So wasn't part of what you were doing to

4    help the physician understand the value of GSK

5    products over competitors' products and for

6    appropriate patients to prescribe GSK products?

7        A   It was my position that I was trained on

8    particular products and I was to promote and market

9    those products based on designated messages from

10   materials that were provided from GlaxoSmithKline,

11   that were approved not only by GlaxoSmithKline but

12   the FDA and all the legal parameters that go behind

13   that.

14       Q   Uh-huh.

15       A   That was my position.

16       Q   I understand your position, but I'm not

17   sure if you answered my question.  So I'm going to

18   go back and ask my question again.

19       A   Sure.

20       Q   Okay.  Isn't it true -- you can use the

21   term "promote" -- we can use the term "promote," but

22   in promoting to physicians, wasn't your objective to

23   get the physician to prescribe a GSK product for

24   appropriate patients as opposed to a competitor's

25   product?

1    the last question.  Keep going.

2         Okay.  Objection.  Nonresponsive to

3    everything after -- to everything after "I write it

4    all the time."

5         Q   Okay.  Let's see what else we have here.

6         If you go to the last page of Exhibit 12,

7    when you say, "I am an achiever, I make things

8    happen," in the third full paragraph, what did you

9    mean by that?

10        A   I like to achieve personal, professional

11   goals.

12        Q   What professional goals were you referring

13   to?

14        A   At that time that I wrote that statement,

15   I'm not sure.

16        Q   And when you say, "I am an achiever, I make

17   things happen," what things were you referring to.

18        In the context of your job, what kinds of

19   things did you like to make happen or did you -- did

20   you make happen?

21        A   I build relationships; I enter all my

22   administrative duties and tasks, expense reports;

23   call on the physicians that I need to call on; try

24   to meet that designated goal because we have -- we

25   have a group of phys- -- of physicians that we're

Christopher, Michael  4/22/2009  9:17:00 AM

1      we're -- that I'm understanding your answers and

2      that you're understanding my questions.

3          A   Sure.

4          Q   Because you said to me -- I believe I

5      understood you to testify that one of the things

6      that you were taught to do in training by GSK is to

7      ask the physician, regardless of their response, to

8      write a prescription for a GSK product; and maybe

9      that's the way I can ask the question.

10         Isn't it true that, as part of your

11     training with GSK, you were trained to ask a

12     prescriber to write a prescription for a GSK

13     product?  Regardless of whether they did or not, is

14     that a true statement?

15         A   There was training to ask for commitment

16     from a physician to either read a clinical, write

17     prescriptions, go to a dinner program, attend a

18     weekend convention.

19         There were multiple questions that we were

20     asked to ask our physicians.

21         Q   Perfect.

22         And one of those questions was to ask them

23     to write a prescription; correct?

24         A   For a GSK product?

25         Q   Yes.

Christopher, Michael 4/22/2009 9:17:00 AM

1      A   Yes.

2      Q   Thank you.

3          (The document referred to was marked as

4          Christopher Exhibit 14 by the Reporter.)

5    BY MS. JOHNSON:

6      Q   Would you take a look at Exhibit 14,

7    please.

8          Is Exhibit 14 a copy of an email from you,

9    dated May 16, 2004, to various people at GSK,

10   "Subject:  JUNE activity"?

11     A   It looks like yes.

12     Q   Okay.  And in Exhibit 14 -- let's see.  I

13   think it's the third -- second or third sentence, it

14   says, "It went extremely well....Harrison said ...

15   he is committed to writing more of products."

16         Did I read that correctly?

17     A   Yes.

18     Q   Is -- was Harrison a prescriber?

19     A   He was.

20     Q   Is it Dr. Harrison?

21     A   Uh-huh.

22     Q   And -- is that -- is that a "Yes"?

23     A   Yes.  I'm sorry.

24     Q   That's all right.

25         And Dr. Harrison, you were reporting --

Christopher, Michael  4/22/2009  9:17:00 AM

1      Do you see that?

2      A  Uh-huh.  Yes.  I'm sorry.

3      Q  Do you have any understanding of what is

4  meant by that?

5      A  No.  Again, I -- I -- I didn't write the

6  email or what his intent of delivering that type

7  of --

8      Q  Once again, just to be clear, I'm not

9  asking you what he intended, but I'm asking you

10  whether, as you sit here today, you have any

11  understanding of what that sentence means, based on

12  your having been in the position and someone to whom

13  the email was sent?

14      A  I could understand -- yeah, I could

15  understand maybe his intent of that particular

16  statement.

17      Q  Okay.  What was your understanding of his

18  intent of that particular statement or what you

19  understood the intent to be?

20      A  You want to be viewed as a resource and

21  knowledgeable about the disease state and the

22  products that at the time I was promoting.

23      Q  And how -- and what kind of considerable

24  thought did you need to give to -- thought did you

25  need to give to the call before you went on the

1    business, where to initiate, and where to steal

2    business"?

3        A  My -- my insight is to -- my thoughts,

4    perhaps, when I wrote this was at the time I know

5    that there was a big kind of a discussion about

6    right message to the right people -- "It's just a

7    matter of targeting the right" -- so "the right

8    message to the right people" would mean talking

9    about the right products to the right physician, in

10   particular, that I had assigned -- had been assigned

11   to.

12       Q  Uh-huh.

13       A  Looking at the data that had been provided

14   by GSK, where to gain business, potentially my

15   thoughts were for the formulary information that we

16   provided to account for a reminder to those

17   physicians.

18       Q  Let me just stop you there.

19           Are you saying, then, that you were using

20   the formulary information to talk to the physician

21   about prescribing drugs for particular patients,

22   based on that formulary information?

23       A  As set forth with some of the direction,

24   yes, that I was given as to --

25       Q  Okay.

Q How was the formulary going to help you in stealing business?

A I don't know. Maybe it was just -- I don't -- I don't remember.

Q Okay. As you go down the paragraph, do you see the section that says:

"As the first hire for you as a manager, I want you to shape me to be a leader within this team, within this industry, and specifically [within] this company."

What did you mean by wanting to be "shaped into a leader"?

A Just professional development.

In one of these -- one of these exhibits, my application for PDP -- I was referring to that type of -- I can't find the document -- but it's referring to the professional development program.

I know it was very early on, but I wanted to express my interest in not only being a pharmaceutical representative but also trying to learn all the different -- different avenues of the pharmaceutical industry as far as management or training or -- just different departments.

Q As a pharmaceutical sales rep, did your

1    district sales managers go out with you when you

2    visited healthcare providers from time to time?

3        A   From time to time, yes.

4        Q   Were those times when your district sales

5    manager went out with you called "ride-alongs"?

6        A   Yes.

7        Q   Okay.

8            (The document referred to was marked as

9            Christopher Exhibit 19 by the Reporter.)

10   BY MS. JOHNSON:

11       Q   Are you familiar with the -- are you

12   familiar with Exhibit 19?

13       A   Yes.

14       Q   Is Exhibit 19 a copy of a GSK Field

15   Coaching Report?

16       A   At that time, yes.

17       Q   And at that time was the GSK Field Coaching

18   Report used in connection with the ride-alongs?

19       A   Yes.

20       Q   Is Exhibit 19 a Field Coaching Report

21   for -- and I apol- -- the writing is very small

22   there -- looks like July 15, 2003.

23           Do you see that in the top right corner?

24       A   It looks to be accurate.

25       Q   And do you see line 6 that says "Quarter to

1     Q  Okay.  And I'd like you to turn to page 3

2  of Exhibit 19, under "Winning Practices," and do you

3  see a list of winning practices?

4     A  Yes.

5     Q  Was one of the winning practices against

6  which your performance measured implementing your

7  "own plan to grow the territory"?  Do you see where

8  I'm looking?

9     A  I do.

10     Q  Okay.  Well, let me ask you a foundational

11  question there.

12         Was it your understanding that, when you

13  went out on field ride-alongs with your district

14  sales manager, the ride-along -- the sales managers

15  were rating your performance against winning

16  practices?

17     A  Initially, I did not know.  And then I

18  was -- we sat down -- because at this time, I think

19  we did a two-day ride-along, where the first day, we

20  were obviously riding along, making calls; the

21  second day, we would -- we would ride-along, and

22  then he would populate information based on what he

23  observed.  And then at that time, we kind of went

24  through all of these things and discussed what his

25  input was.

Christopher, Michael  4/22/2009  9:17:00 AM

1      Q   Let me ask that again.

2          Was it your understanding at some point, by

3      the end of the ride-along, that your district sales

4      manager was rating you based on the criteria of

5      winning practices?

6      A   In addition to other parameters, yes.

7      Q   Yes.  Okay.  And was one of those practices

8      that you were rated against implementing your "own

9      plan to grow the territory"?

10     A   I want to answer the question, but I also

11     want to say that it's not implementing my own

12     territory --

13     Q   Okay.

14     A   -- or my own plan because it's just not my

15     own plan.  It's under this directive or

16     discretion --

17     Q   Okay.

18     A   -- of what we can and can't do --

19     Q   Right.

20     A   -- and its parameters.

21     Q   And let -- let -- let's just kind of clear

22     that up.

23         We know there are laws that govern what you

24     as a pharmaceutical sales rep can and cannot do;

25     correct?

1    plan to grow the territory?

2        A   Without having all of the standard

3    operating procedures, binder, and all of that in

4    front of me and having the resource to review those,

5    I -- I can't speak on what those parameters are

6    because I don't remember.

7        Q   Okay.  And for the purposes of these

8    questions, we're going to assume that you were

9    following the law and you were following those GSK

10   guidelines that were -- are you familiar with the

11   term "Commercial Policies and Practices," the CPP?

12        We're going to assume that you were in

13   compliance with the CPP.

14       A   Yes.

15       Q   All right.  So with that caveat, I'm going

16   to ask the question again.

17        Was it your understanding that one of the

18   winning practices against which your performance was

19   rated was implementing your own "plan to grow the

20   territory"?

21       A   Yes.

22       Q   Was one of the winning practices against

23   which your performance was rated gaining "insight

24   into key customers"?

25       A   With information provided by GSK, yes.

Christopher, Michael 4/22/2009 9:17:00 AM

1      Q   Correct.  Because you did have a list of

2   doctors that you were -- that were approved for you

3   to call on; correct?

4      A   Correct.  And I'm just simply stating --

5      Q   Right.

6      A   -- that, with information that was

7   provided, I was able to "Gain insight into key

8   customers."

9      Q   And was it your understanding that one of

10   the reasons for having a list was that the company

11   would not want you to call on doctors where you

12   might make off-label-type presentations?

13      A   I would agree to that, in addition to I

14   wasn't to call on physicians that weren't approved

15   from GSK to call on, for whatever reason.  They just

16   weren't in my database.

17      Q   Right.  Was one of the winning ex- --

18   winning practices against which your performance was

19   judged building "strong business relationships with

20   customers"?

21      A   Yes.

22      Q   Was one of the winning practices "Masters

23   disease areas and product knowledge"?

24      A   Yes.

25      Q   Was one of the areas preparing "for each

1    call"?

2        A   Yes.

3        Q   And then it -- there's an indication:

4            "Shane has already learned how to

5            look at the data and analyze the

6            trends [and] growth tab and to

7            formulate a growth plan where to go

8            in the call.  His pre-call planning

9            was [very] good."

10           What type of precall planning did you do?

11       A   Based on just looking at this information

12   now and trying to recall the events that took place,

13   I would -- I would say that it was having a -- a

14   plan of action as to, when I first got into the

15   territory, I met with my counterparts as previously

16   mentioned, a few of them, about which phys- --

17   physician offices to go to.

18           So, for instance, I precall planned to

19   coordinate, if we were going to go visit a physician

20   on that particular day, that that physician was

21   actually in the office that day.  You don't want to

22   go somewhere where they're not in or they're at a

23   different location.

24           So that would be -- that would be what I'd

25   take from this and just kind of looking at the

1   information that we had available to us for -- for

2   those particular physicians that we saw for those

3   one-day or two-day events, ride-alongs.

4       MS. JOHNSON:  (To the reporter)  Go down.

5   Okay.

6       Q   Was one of the winning practices against

7   which your performance was rated was to "Engage each

8   customer in a dialogue about products"?

9       A   Yes.

10      Q   Was one of the winning practices against

11  which your performance was rated "Gains the best

12  possible commitment on every call"?

13      A   Yes.

14      Q   And was one of the winning practices

15  against which your performance was rated

16  "Continually adds value to the customer"?

17      A   Yes.

18      Q   Was one of the winning practices against

19  which your performance was rated "Demonstrates

20  initiative, passion and persistence to get results"?

21      A   Yes.

22      Q   And then on what's Bates number pages

23  15695, there's a section "ASAP Selling Model."  Do

24  you recall what "ASAP" stood for?

25      A   No.

Christopher, Michael  4/22/2009  9:17:00 AM

1    other, which I cannot recall at this -- at this time

2    of what they changed it to, but there was certainly

3    a change.

4        Q   Okay.  So there were times where you were

5    incentivized based on changes in market volume and

6    times when you were incentivized based on changes in

7    market share; is that correct?

8        A   To my recollection -- recollection, I --

9    yes, that is correct.

10       Q   Okay.  Once you transferred to Arizona in

11   2006, did Mr. Golson continue to participate in

12   ride-alongs?

13       A   Yes.

14       Q   How often would Mr. Nash go on ride-alongs

15   with you?

16       A   I --

17       Q   Give us an estimate.  Once a month?

18       A   Once a month, once every other month.

19       Q   And day to day what kind of interaction or

20   how much interaction would you have with -- did you

21   have with Mr. Nash?

22       A   Both with Mr. Nash and with Mr. Golson --

23       Q   I'm only asking you about Mr. Nash now.

24       A   Okay.  For Mr. Nash, I communicated with

25   him either on the phone, through voicemail, through

Christopher, Michael  4/22/2009  9:17:00 AM

1    email, or I would run into him and another

2    representative periodically.

3         Periodically, run into those people.  I

4    would -- mostly, it was conversations on the phone

5    or -- or voicemail or emails.

6         Q  And my question may not have been clear.  I

7    asked you -- well, how often did you have

8    interaction with Mr. Nash?

9         A  Daily or every other day.

10        Q  And what kind of interaction would you have

11   with Mr. Nash daily?

12        A  Daily, it was voicemail or actually talking

13   to him on the mobile phone or -- or emails.

14        Q  And what types of things did you talk with

15   him about daily?

16        A  Business.

17        Q  What kind of aspects of business?

18        A  "Where are you?  Where are you going?  What

19   are your messages?  Are you guys meeting as a team?

20   How's your routing?  Is there anything I can help

21   you with?  Resources you have?  Resources you don't

22   have?"

23        Q  Okay.  And you said you talked with him on

24   the phone, and you left voicemails and emails as

25   well?

1    Report, dated January 29th, 2004, when Mr. Nash was

2    your district sales manager?

3      A  Yes.

4      Q  Under -- on page 3 -- let me give you the

5    number.  The number is 17046 under "Summary."

6        If you go to I think it's line 85 under the

7    "Summary:"

8          "Shane is doing a great job and

9         is learning how to balance and sell

10        the complete portfolio."

11       Do you see that?

12     A  Yes.

13     Q  What was your understanding as to what you

14    were doing as far as selling a "complete portfolio"?

15     A  I don't -- I don't know what his intention

16    on writing that is.

17     Q  See, I'm sorry.  I'm not asking you what he

18    meant.

19     A  I'm trying to answer.

20     Q  I'm asking what you understood.

21     A  Okay.  Again, I don't know what his

22    intention of writing that sentence was, but my

23    understanding would be that it was -- that I'm

24    delivering all the -- the key messages to the right

25    physician at the right time for the entire portfolio

1    products that I -- that I was responsible for

2    promoting.

3        Q   Okay.  Under -- if you go to line 41 on

4    page 2, the second sentence, Shane -- oh --

5            "He is learning more about what

6            will drive [the] business and how to

7            utilize his data to really get a

8            handle on which customers to target

9            and maximize."

10           Did you have an understanding of what that

11   term "driving the business" meant?

12       A   No.

13       Q   You've never heard that term other than in

14   this document?

15       A   I've heard the term but I --

16       Q   Let -- let me ask you a general question.

17           When you've heard that -- when you heard

18   that term within GSK, what was your understanding of

19   the term, quote, "drive the business," close quotes?

20       A   Seeing the right physicians the right

21   amount of times based on the frequencies, delivering

22   the core key messages that we were trained on on

23   these particular products that we're assigned to

24   promote to these key physicians.

25       Q   And was part of that getting a commitment

Christopher, Michael 4/22/2009 9:17:00 AM

1    from the physician to write the prescriptions in

2    terms of driving the business?  Was that part of how

3    you were driving the business?

4       A   I wouldn't just say that part of driving a

5    business is to get a commitment.  I would say that

6    it would be to build a relationship and to be valued

7    as a resource in bringing information to the

8    physician to make him aware of all of the

9    information as far as safety, efficacy, tolerability

10   for the products, and to --

11      Q   Okay.

12      A   -- to drive business.

13      Q   By getting prescriptions.  By getting the

14   physician to write prescriptions for the appropriate

15   patients of GSK products; correct?

16        MR. PRUITT:  Objection.  Form.

17        THE WITNESS:  I would ask for business or

18   commitments for multiple different things.

19   BY MS. JOHNSON:

20      Q   Including writing prescriptions for the

21   appropriate patient; correct?

22      A   Writing prescriptions for the appropriate

23   patient type; correct.

24        MS. JOHNSON:  Thank you.

25        We're going to go off the record for just a

Christopher, Michael 4/22/2009 9:17:00 AM

1    involved?

2       A  I don't believe I was, no.  I don't recall.

3       Q  You talked about reviewing data in

4    connection with your visits to physicians -- to

5    physicians' offices.

6          Did you ever ask the physicians questions

7    during your calls?

8       A  We were allowed to ask specific questions

9    about core messages that we were to -- to deliver or

10   information that we were able to kind of engage a

11   physician.

12      Q  Why did you ask questions?

13      A  That was part of my job.

14      Q  But for what reason?  I understand it was

15   part of your job, but what information were you

16   trying to elicit from physicians in asking them

17   questions?

18      A  To get a dialogue going instead of just me

19   coming in and talking.

20      Q  And why did you want to get a dialogue

21   going?

22      A  That's the way that the training took

23   place, initial training, ongoing training, that we

24   participated in.

25          I can't recall what the actual class was

1    called, but there would be scripted -- scripted

2    verses that we would -- we would go through and

3    scenarios that we would go through in training, as

4    well as they -- GSK invited physicians in that we

5    would interact with and kind of go through the

6    dialogue that we were trained on and kind of any

7    objection that the physician would approach us with.

8        There was scripted dialogue that we would

9    give response to and pull out information and

10   resources to kind of help with that.

11       Q   You -- you were pulling out information and

12   resources to overcome the objections; correct?

13       A   Correct.

14       Q   And the objections would be to things like

15   prescribing a GSK product; right?

16       A   Not necessarily prescribing a GSK product.

17   I -- I mean, I -- I -- there were so many different

18   conversations and -- and interactions with

19   physicians.  I can't -- I can't give you all of

20   them.

21       Q   I'm not asking you for all of them.  I'm

22   asking you for some of them.

23       So let's -- let's just start again.

24       In addressing physicians' objections, were

25   the objections generally to the physician wanting to

Christopher, Michael 4/22/2009 9:17:00 AM

1    prescribe the GSK product about which you were

2    talking with the physician?

3        A   Sometimes yes; sometimes no.

4        Q   For those "sometimes yes" instances, how

5    would you go about overcoming the objections to

6    prescribing a GSK product?

7        A   Again, there were scripted-type responses.

8    If physicians said, "Well, I don't prescribe it

9    because it's not on Blue Cross, Blue Shield," for

10   whatever reason --

11       Q   Uh-huh.

12       A   -- if I had the resource that showed that a

13   particular product was or was not on that formulary,

14   I would have shown him that information.

15       Q   Can you give some other examples of

16   objections.

17       A   There's not one in particular that kind of

18   just --

19       Q   Uh-huh.

20       A   -- pops out.

21           Yeah, I guess -- "Is it safe?" then you

22   would pull out safety information --

23       Q   Right.

24       A   -- as far as --

25       Q   And I'm sorry.  We got on this whole line

1    of questions because I asked you what kind of

2    questions you asked the doctor, not what kind of

3    questions the doctor asked you.

4         What kind of questions would you ask

5    physicians?

6         A   What kind of question [verbatim] would I

7    ask physicians?

8         Q   Yes.

9         A   There's a myriad of questions that we were

10   kind of approved to ask.  When do they use a

11   product?  How do they use a product?  And why do

12   they use a product?  That would part of the

13   "when/why/how" scenario.

14        Q   Right.  And did you always ask every

15   prescriber the same questions every time?

16        A   Not every time.

17        Q   How would you decide what questions to ask?

18        A   It was based on kind of looking at the data

19   that -- I mean, obviously, if I come in and asked

20   you your name every time I saw you, you'd probably

21   get annoyed; and so that type of questioning to a

22   physician, if I asked him when does he prescribe a

23   medication, at some point, he would be, like, "Okay.

24   We already covered this."

25        So then I would -- through directives of --

Christopher, Michael 4/22/2009 9:17:00 AM

1    of marketing and promoting materials and -- and that

2    sort of thing, I would present information on a

3    particular clinical that was able to -- we were able

4    to -- to share with the physician or the sales aid,

5    different pages in the sales aid that -- that we

6    could use to formulate a question of, you know, "Are

7    you familiar with how a particular product works or

8    the efficacy of a particular product?"

9        Q   And those questions would be -- you would

10   tailor those questions based on where you were with

11   that prescriber in terms of your relationship and

12   getting to a commitment; right?

13       A   Based on the direction and interactions

14   with my teammates and my manager, if -- you know,

15   for instance, when I very first started -- I can't

16   just, you know, go in and -- and just act like I've

17   been calling on this physician for -- for years.

18          It is kind of a "Hey, how are you doing?"

19   learn office policies, procedures, interact with the

20   physician, try to find out just information about

21   him and his practice, and try to correlate that with

22   the information that was in the computer to make

23   sure that it was kind of up to date.

24          And then based on that, I would ask where,

25   when, and how -- or when, why, and how they would

Christopher, Michael  4/22/2009  9:17:00 AM

1     use GSK products.

2         Q   Why would you ask those questions?

3         A   That's what we're in the position to do is

4     find out information from a physician and to promote

5     and market GSK products.

6         Q   I'm sorry.  I think I asked you why would

7     you ask that -- why would you ask those questions,

8     and you said you were in the position to find out

9     information, but what would you do with that

10    information?

11        A   Use it and correlate it to the information

12    that GSK has provided.

13        Q   For what purpose?

14        A   To market and promote GSK products.

15        Q   In order to increase either market volume

16    or market share ultimately; correct?

17        A   Correct.  To promote and market GSK

18    products.

19            (The document referred to was marked as

20            Christopher Exhibit 22 by the Reporter.)

21    BY MS. JOHNSON:

22        Q   Are you familiar with Exhibit 22?  Take a

23    few minutes to look through it.

24            Are you familiar with Exhibit 21?

25        A   I am.

1        Q  22. I'm sorry. 22?

2        A  I am.

3        Q  And is Exhibit 22 a copy of the

4     "Field Coaching Tool Kit for Sales Professionals"?

5        A  Yes.

6        Q  Go to page 16800.

7           Actually, I'm going to have you go to

8     page 16803.

9           And you recall earlier we talked about

10    various winning practices on the Field -- that are

11    indicated on the Field Coaching Report?

12       A  Yes.

13       Q  And if you go to page 16803, take a look at

14    page 16803 through 16807.  Do you see that?

15          Are those the winning practices No. 1 --

16    Nos. 1 through 9 that were part of the

17    Field Coaching Tool Kit?

18       A  It appears to be, yes.

19       Q  Okay.  And were you, as a sales -- a

20    pharmaceutical sales rep rated as "Foundational,"

21    "Proficient," or "Expert" in each of the areas 1

22    through 9?

23       A  Yes.

24       Q  And would you confirm for me that there are

25    certain winning practices listed as foundational

1  winning practices listed as "Proficient" and winning

2  practices listed as "Expert" under each of those

3  categories 1 through 9?

4   A  Yes, there are.

5   Q  And it was -- was it your understanding

6  that you were rated by your district sales managers

7  as "Foundational," "Proficient," or "Expert" with

8  respect to each of those nine winning practices?

9   A  Yes.  That was my understanding.

10   Q  And, in some instances, you were found to

11  be "Foundational"; but in some instance, you

12  actually got to be an "Expert" with respect to

13  certain winning practices; correct?

14   A  Yes.

15   Q  If you go to page 19 of Exhibit 22, No. 7,

16  "Gains The Best Possible Commitment On Each Call."

17      And under "Expert," do you see E3?

18       "Always leaves the office with a

19       tangible 'next step' commitment that

20       increases the importance of the next

21       call."

22   A  Yes.

23   Q  What was your understanding of how you

24  would go about doing E3 as a sales rep?  How --

25  what -- what was expected of you in order to be an

Christopher, Michael  4/22/2009  9:17:00 AM

1    "Expert"?

2        A   I don't -- I actually don't recall ever

3    having an "Expert" in that category.  So to get

4    there, I -- obviously, I didn't reach that

5    objective.

6        Q   And you didn't have any understanding of

7    what it would take to get there?

8        A   I think -- again, I mean it's -- I'm trying

9    to recall these events.

10           Perhaps I didn't ask for a commitment on

11   every call.  That's the reason why I never -- or

12   potentially didn't have "Expert" in No. 7 for a

13   commitment on every call.

14       Q   Do you recall going to any training on what

15   was referred to as the "Worldwide Sales Force

16   Excellent -- Excellence Program"?

17       A   I think that was in conjunction with a

18   training, yes.

19       Q   And do you recall whether that training was

20   at the district, regional, or national level?

21       A   It might have been national.  I -- I can't

22   recall what --

23       Q   Well, if it was --

24       A   -- what level.

25       Q   Did you go to a national meeting where you

Christopher, Michael 4/22/2009 9:17:00 AM

1   recall the worldwide sales force excellence being

2   discussed?

3       A   It was discussed, I believe, at the

4   Avandaryl launch, but I can't recall if it was -- if

5   it was rolled out prior to that or -- or when it was

6   implemented.

7       Q   Okay.  All right.

8           (The document referred to was marked as

9           Christopher Exhibit 23 by the Reporter.)

10  BY MS. JOHNSON:

11      Q   Is Exhibit 23 a copy of a Field Coaching

12  Report, dated October 5th, 2006, by district sales

13  manager, Joe -- Joe Golson?

14      A   Yes.

15      Q   Okay.  If you go to the last page of

16  Exhibit 22 [verbatim], under the "Focus on Winning

17  Practices," what -- you rated as "Proficient" in the

18  three winning practices listed:  No. 1, "Implement

19  your own plan to grow the territory; No. 2, Engage

20  each customer in a dialogue about products; No. 3,

21  continually [to] add value to the customer."

22      A   Yes, I am.  You asked me if I --

23      Q   If you were rated "Proficient."

24      A   Yes, I am, or I was at this time.

25      Q   Now, under the comments -- and this is a --

GlaxoSmithKline / Christopher

Page 162

1          for the business.  He pursued his

2          objective."

3              Was that identified as an area of strength

4      for you with respect to your precall planning?

5          A  Yeah.  I did exactly as I planned.  I --

6          Q  And how --

7          A  -- asked appropriate, approved questions;

8      provided the appropriate, approved information; and

9      I asked for a commitment.

10         Q  Okay.  And when you say "asked for a

11     commitment," you're referring to the section of that

12     box that says "and asked for the business"?

13             And, if you're not, how did you go about

14     asking for the business?

15         A  I don't recall exactly what the specific

16     question was.

17         Q  Can -- can you recall any ways in which you

18     went about asking for the business apart from this

19     form?

20         A  "Would you come to a dinner program with an

21     approved speaker?  Would you read a clinical reprint

22     and give me your thoughts on the validity of -- of

23     what you think of it?  Will you prescribe

24     medications?"

25         Q  Okay.  Under "Closing and Bridging," under

Christopher, Michael  4/22/2009  9:17:00 AM

1    "Areas of Strength":

2        "Good close with Dr. Ahmad asking

3       him to prescribe Boniva for new

4       patients and for patients wanting

5       more convenient dosing or lessened GI

6       side effects."

7       Now, with respect to -- let me just ask a

8    different question.

9       With respect to Exhibit 25, you are rated

10   as "Expert" in Winning Practices 1 and 2, but

11   "Proficient" as far as Winning Practice No. 3;

12   correct?

13       A   Correct.

14       Q   All right.  Did you plan -- did you plan

15   any after-hour events for prescribers?  When I mean

16   [verbatim] "after-hour events," I mean any types of

17   CMEs?

18       A   There were speaker events, and then there

19   were one-on-one dinners, yes.

20       Q   And when you were working in Kentucky, did

21   you plan speaker events?

22       A   A lot.

23       Q   What was the purpose of the speaker events?

24       A   To have an approved speaker come in to --

25   an approved speaker from GSK Speakers Bureau list --

Christopher, Michael 4/22/2009 9:17:00 AM

1      Q   Approximately how many prescribers did you

2   call on a day?

3      A   On average, it was between eight and ten.

4      Q   Okay.  And you were required to be in the

5   field from 8:30 to 5:00; right?

6      A   Yes.

7      Q   When you called on each of those eight to

8   ten prescribers, is it accurate that you modified

9   your approach somewhat based on the previous call

10   you'd had?

11      A   Can you give a definition of "modified."

12      Q   Sure.

13         In other words, if you had established a

14   certain level of commitment for Physician A during

15   the last call, you would try to get a different

16   level of commitment from Physician A on the next

17   call; correct?

18      A   Based on kind of a --

19      Q   I'm not referring to the document now.  I'm

20   just talking generally.

21      A   No.  I'm just -- based on information that

22   I had with physicians and data that was provided,

23   if -- if -- because they were all approved messages

24   that -- that myself and others were using, we could

25   use -- based on -- on the history, we would use a

Christopher, Michael 4/22/2009 9:17:00 AM

1      A  I had my home office, and I had a storage

2   unit; so it's not really considered an office, but

3   it was a storage unit.

4      Q  That's why I want to ask my question again

5   because I didn't ask --

6      A  I just was clear.

7      Q  I understand.  I'm asking -- let me ask the

8   question.

9          When you worked in Kentucky, did you have

10   any office other than your home office?

11      A  No.

12      Q  When you worked in -- for GSK in Arizona,

13   did you have any office other than your home office?

14      A  No.

15      Q  One of the things that you seek in

16   connection with this lawsuit is payment for your

17   overtime wages; correct?  Payment of overtime wages;

18   right?

19      A  Correct.

20      Q  About how many hours per week would you say

21   you worked in your home office outside of the

22   territory?  Being in the territory?

23      A  Outside of being in the territory from

24   8:30 to 5:00.

25          In addition to those hours, it would range

1    hour, two hours, to kind of go through that; and

2    those occurred, I think, quarterly or biannually.

3    I -- I can't recall how often those occurred.

4        Q   Uh-huh.  And you talked earlier about

5    the -- about the fact that you wanted to stay

6    current on disease states and was -- are you

7    including that learning as part of your eForce

8    modules?  Or is that something separate?

9        A   That was in addition to -- well, the hours

10   for the eForce learning were sporadic; so, you know,

11   I might look at one week, this -- this eForce

12   learning module.  Next week I might look at the

13   clinicals that were provided and read through --

14   through those; so I guess that would be kind of, on

15   average, couple hours a week or whatever I -- one or

16   two hours, whatever I listed.

17       Q   Okay.  How did you determine what samples

18   to leave with a particular prescriber?

19       A   It was -- I think there was mention in an

20   email to be -- you know, if -- if samples are

21   falling off the shelf, you don't want to leave more;

22   but if there is one box of a particular sample, you

23   would want to leave a few samples -- not -- not an

24   abundant amount but enough to at least get a patient

25   started for a couple weeks.

1        And that was the direction of -- of

2    management, not only districtwide; but I think the

3    email that you gave me was a -- was a regional

4    vice president so, even at that level, was stating

5    don't make -- don't make samples fall off the shelf,

6    but leave enough to where a physician could start a

7    patient.

8        Q   And you'd pretty much decide how many

9    samples to leave based on what you saw?

10       A   Based on the direction from management and

11   based on what was available on the shelf, I would

12   disseminate, you know, "Should I leave four?  Should

13   I leave eight?"

14       Q   What was the direction from management that

15   you're referring to?

16       A   It was clearly in the -- in the email.

17       Q   Well, that was one email for one period in

18   time, and you said you didn't remember the email at

19   all; so --

20       A   Well, I'm just look- -- talking about the

21   email that I got today.  I briefly read through it

22   and just said -- just make sure that there's plenty

23   of samples for patients.  And the direction from my

24   manager was just "Make sure that there's samples on

25   a shelf."

1      Q   Well, just so we're clear, go to and find

2    the exhibit that you're referring to because, when I

3    talked to you earlier, you said -- about it earlier,

4    you said you didn't recall receiving it at all.

5         It was the one from Mr. Peterson, I

6    believe, and you said you didn't remember who it

7    was, you don't remember getting it.

8      A   I did not remember getting it.  I do not

9    remember who he was; but reading through it, it's

10   just talking about samples.

11     Q   Right.  And so what direction -- since you

12   don't remember that direction specifically, I would

13   like to identify what direction you received as to

14   samples from management?

15     A   I just stated that the direction from my

16   district sales manager was, "If there are samples

17   falling off the shelf, you don't need to leave any."

18     Q   Okay.

19     A   "If there's one box or no boxes of samples,

20   you need to leave a few."

21     Q   Okay.  And that was -- that was the only

22   thinking that went into -- that you -- that was the

23   only -- those were the only parameters that you used

24   in deciding what samples to leave was whether they

25   were falling off the shelf, whether there was one or

1     two boxes left; and then you just said, "Well, I

2     guess maybe I'll leave four, or maybe I'll leave

3     three"?  There wasn't any --

4          A   It's pretty clear cut.  I mean, it --

5     either you -- you leave a couple of samples or you

6     don't.

7          Q   Okay.

8          A   But to answer your question about this

9     email --

10         Q   Well, what exhibit are you referring to,

11    please?

12         A   This is Exhibit 17.

13         Q   And you -- like I said, you said you didn't

14    recall the email; so --

15         A   Again, I -- when you handed me this piece

16    of paper, Exhibit 17, I did not recall the email.

17         Q   Do you recall it now?

18         A   Because I have it, yes.

19         Q   But, no, do you recall receiving the email

20    when you got it other than what you read today?

21         A   I do not recall receiving this email.  I do

22    not recall meeting Gregg Peterson.

23         Q   Okay.

24         A   Based on the information --

25         Q   All right.

Christopher, Michael  4/22/2009  9:17:00 AM

1        (The document referred to was marked as

2        Christopher Exhibit 27 by the Reporter.)

3        THE REPORTER:  27.

4    BY MS. JOHNSON:

5        Q   Do you recognize Exhibit 27?

6        A   Yes.

7        Q   Is Exhibit 27 another version of "winning

8    practices" that was in place during the time you

9    worked for GlaxoSmithKline?

10       A   I believe this was in place when I was

11   employed, yes.

12       Q   Okay.

13       (The document referred to was marked as

14       Christopher Exhibit 28 by the Reporter.)

15       THE REPORTER:  28.

16   BY MS. JOHNSON:

17       Q   When you went to work for GSK in March,

18   2003, is it accurate that your base salary was

19   $38,500 per year?

20       A   I believe that's correct.

21       Q   And we're looking at Exhibit 28.

22       A   Yes.  But the base salary was -- yeah.

23   I -- I believe that that's when I started.

24       Q   And, then, in April, 2005, you received a

25   promotion; and your base salary went up to -- I'm

1    sorry -- that you had a pay increase up to $43,010,

2    effective May 31st, 2004; correct?

3        A   Correct.

4        Q   Then between April 4th, 2005, and May 30th,

5    2005 -- I'm sorry -- let me go back.

6        Yeah.  Between April 4th, 2005, and

7    May 30th, 2005, you earned $46,021 in terms of your

8    base salary; right?

9        A   Correct.

10       Q   And between May 30th, 2005, and May 29th,

11   2006, you earned $47,410 in base salary?

12       A   That was up until April 3rd of 2006.  And

13   then it changed to 48,710 on May 29 of '06.

14       Q   Okay.  And then between September 4th,

15   2006, and the time of your termination from GSK, you

16   were earning an annual salary of $51,840; right?

17       A   Correct.

18       Q   If you go back to your offer letter -- I

19   think it's Exhibit 3.

20       A   Yes.

21       Q   In Exhibit 3, you were told that your

22   annual target for sales incentive compensation was

23   $21,000; correct?

24       A   Correct.

25       Q   And your incentive comp was paid on a

Christopher, Michael 4/22/2009 9:17:00 AM

1    quarterly basis; right?

2        A   Correct.

3            (The document referred to was marked as

4            Christopher Exhibit 29 by the Reporter.)

5            THE WITNESS:  Thank you.

6    BY MS. JOHNSON:

7        Q   Did each of the people -- each of the

8    pharmaceutical sales rep -- reps in your pod have a

9    different plan of action or POA?

10       A   Based on their product portfolio.

11       Q   Let me ask the question again.

12           Based on their product portfolio, did each

13   pharmaceutical sales rep in your pod have a

14   different plan of action?

15       A   Yes.

16       Q   And the plan of action identified the

17   weighting of various products with respect to

18   incentive compensation; correct?

19       A   Correct.

20       Q   Did the weighting of the various products

21   in any way influence which prescribers of the

22   approved ones that you called on?

23       A   To an extent, I would say yes, but we were

24   to call on -- we were given a plan of -- of action

25   to call on a list of physicians.

1      Q   All right.

2      A   There were other teams.

3      Q   But not that you were on?

4      A   Not that I was -- not that I was on;

5   correct.

6      Q   Okay.

7          THE REPORTER:  30.

8          (The document referred to was marked as

9          Christopher Exhibit 30 by the Reporter.)

10  BY MS. JOHNSON:

11     Q   And so your target for incentive

12  compensation was $21,000 a year.

13         Is it true that it was possible for you to

14  earn more than $21,000 a year in incentive

15  compensation?

16     A   To my knowledge and based on the results

17  from Exhibit 30, yes.

18     Q   I'm sorry.  I wasn't looking at Exhibit 30.

19  I'm -- I'm asking you generally.

20         Was it your understanding --

21     A   Yes.

22     Q   Was it your understanding that you could

23  earn more than $21,000 a year in incentive comp?

24     A   Yes.

25     Q   And, in fact, did you earn more than

Christopher, Michael  4/22/2009  9:17:00 AM

1     $21,000 a year at any time when you worked at GSK?

2         A  Yes.

3         Q  What's the maximum amount that you recall

4     receiving in incentive comp?

5         A  For a quarter or for a year?

6         Q  Let's do it by quarter.

7         A  I think the highest that I made in a

8     quarter was 13- or 15,000.

9         Q  Okay.

10        A  Approximately.

11        Q  You said that -- I believe I understood you

12    to testify earlier that you believed that some of

13    your job activities influenced the amount of

14    incentive compensation that you received; correct?

15        A  I would have to look back to see if that's

16    accurate.

17        Q  Well, let me ask you again, assuming the

18    answer will be the same.

19            Did any of your -- do you believe that any

20    of your job activities influenced the amount of

21    incentive compensation you received?  Understanding

22    you don't understand exactly how it got calculated

23    and the algorithms that went into it, but do you

24    think that anything you did in terms of your job

25    influenced the amount of incentive comp you

Christopher, Michael  4/22/2009  9:17:00 AM

1    received?

2        A   I would speculate there's a potential that

3    my activity contributed to incentive comp, yes.

4        Q   And do you have any idea what things you

5    did improved or increased the amount of incentive

6    comp you received?

7        A   Promoting and marketing the products and

8    the messages that were -- that I learned and was

9    trained on.

10       Q   Okay.  If you look on page 2 of Exhibit 30,

11   I think it is --

12           THE REPORTER:  31.

13           (The document referred to was marked as

14           Christopher Exhibit 31 by the Reporter.)

15   BY MS. JOHNSON:

16       Q   Page 2 of Exhibit 31, you see

17   "Winners' Circle Points"?

18       A   Uh-huh.

19       Q   Yes?

20       A   Yes.  I'm sorry.

21       Q   That's all right.

22           How were Winners' Circle points

23   accumulated?

24       A   I -- I don't recall how they were

25   calculated or what algorithms were used.

GlaxoSmithKline / Christopher

Christopher, Michael  4/22/2009  9:17:00 AM

1    Q  Did you discuss the dosing benefits of the

2    product?

3    A  Yes.

4    Q  Did you discuss the patient type that the

5    product would be appropriate for?

6    A  Yes.

7    Q  And did you discuss the advantages of the

8    GSK products versus competitor products?

9    A  I don't know if I said "advantages."

10    There were messages to say why.

11    Q  Let me ask you a different question.

12    Did you discuss the benefits of the GSK

13    products over competitor products within guidelines?

14    A  I think I just spoke on the benefits of GSK

15    products.

16    Q  Okay.  And I think you've testified you

17    responded to questions that were posed to you by the

18    healthcare providers?

19    A  Yes.

20    Q  Is it accurate -- you attempted to build a

21    relationship with the providers?

22    A  That would be correct.

23    Q  And did you attempt to address objections

24    that the providers posed to prescribing more GSK --

25    or to prescribing GSK products?

1        A   Based on -- on responses we were allowed to

2    say, yes.

3        Q   Is there any aspect of a sales call that --

4    was there any aspect of a call on a prescriber that

5    you felt made one call more successful than another?

6        A   Not one that just really pops out.

7        Q   No.  I mean just generally to try to

8    determine whether it's a successful call as opposed

9    to a not-so-successful call, were there any criteria

10   that, in your mind, made one call more successful

11   than another?

12       A   No.  Because there was nothing tangible or,

13   you know -- there was no cash exchanged to say,

14   "Well, great, you know, I -- that was a great call

15   base I've got, you know, a check for whatever."

16       So -- so no.

17       MS. JOHNSON:  Okay.

18       (To the Reporter)  Would you go back.

19       Objection.  Nonresponsive to everything

20   after "No."

21       Q   Has anyone at GSK ever told you you cannot

22   work from home?

23       A   Meaning -- what do you mean "work from

24   home"?

25       Q   That you could not work from home.  That

1    communications that Mr. Golson had? Or did he have

2    any that were different that you can remember?

3        A   Those -- I -- you know, I just -- again,

4    just kind of the basic communication with your team,

5    communicate with your computer, communicate with

6    your manager even though it wasn't listed as part of

7    the -- the PowerPoint presentation, it just -- I --

8    I would assume that you would communicate with your

9    manager, even though you don't have a PowerPoint

10   presentation, stating that that was part of the

11   communication.

12       Q   Uh-huh. Right.

13       A   So I -- that's -- that's pretty accurate as

14   far as communication.

15       Q   Okay. Other than attorneys at

16   Jackson White, have you had any discussions with any

17   other attorneys about the lawsuit?

18       A   I have not had any discussions with other

19   lawyers pertaining to this case outside of

20   Jackson White, no.

21       Q   Okay. Other than -- have you talked with

22   any of your coworkers at your current employers

23   about this lawsuit?

24       A   No.

25       Q   Okay. Is it accurate that your employment

1    with GSK ended on May 17, 2007?

2        A   That sounds accurate.

3            (The document referred to was marked as

4            Christopher Exhibit 34 by the Reporter.)

5            THE REPORTER:  34.

6    BY MS. JOHNSON:

7        Q   You've been handed what's been marked as

8    Exhibit 34.

9            Is it accurate that you were told in

10   Exhibit 34 that the company had determined that you

11   had violated GSK's code of conduct?

12       A   Can you repeat the question.  I'm sorry.

13       Q   Is it accurate that in Exhibit 34 GSK --

14   and specifically Mr. Golson -- tells you that you're

15   being terminated because there was a determination

16   you had violated GSK's code of conduct?

17       A   Correct.

18       Q   Prior to your termination, were you

19   interviewed in the course of an investigation?

20       A   I was.

21       Q   Did Terry Schaeffer interview you?

22       A   I can't recall the -- I know she was

23   female.

24       Q   Okay.  Was it your understanding that

25   Terry Schaeffer -- was -- was it your understanding

Christopher, Michael 4/22/2009 9:17:00 AM

1    that the person who interviewed you was from the

2    Compliance group, GSK's Compliance group?

3        A  I can't recall whether she stated what

4    department she was from. She just -- I recall that

5    she stated that she was there to ask me some

6    questions relating to some of the physicians that

7    were in my geography.

8        Q  Okay. And did -- were you interviewed at

9    the Embassy Suites in Phoenix?

10       A  That sounds correct.

11       Q  And were you asked questions about your

12   call reporting activity?

13       A  Yes.

14       Q  Did you tell the interviewer that you would

15   sometimes record a call in PassPort for a healthcare

16   provider who was unavailable if you detailed other

17   healthcare providers in the same office?

18       A  I -- because I did not get a copy of the

19   documents that she had and/or the recordings that

20   she made note of, I -- I recall telling her that,

21   because of the mandate of making calls on

22   physicians, there are a few no-see offices

23   throughout the United States within the

24   pharmaceutical industry that are absolutely no-see.

25   You can't get past the front desk. Physician -- I

Christopher, Michael  4/22/2009  9:17:00 AM

1   couldn't even pick a physician out of a -- out of a

2   lineup if they were lined up in front of me.

3        And talking with other representatives

4   throughout the nation, there are offices that are

5   like that, in my particular case.

6        I did share with her I left information for

7   a particular physician, spoke to that physician's MA

8   or medical assistant or billing nurse -- or -- or

9   somebody within that office that worked with that

10  physician.

11       I shared information with them, as I would

12  with a physician, and also left resources behind

13  that we would typically leave in any given day for a

14  physician to acknowledge and read and -- and that

15  sort of thing.

16       And I submitted a call.

17       Because we were not allowed to type in a

18  response or a call note just as it happened, I

19  wasn't able to distinguish what I had did -- or --

20  or what I had done for -- for these particular

21  physicians.

22     Q   Okay.  Is it accurate, then, that there

23  were healthcare providers that you attempted to call

24  on that you didn't see face to face but you recorded

25  the visit as a call?

1      A  For these providers -- Schlomer,

2   Sorkin-Wells and Kathleen Schwartz -- I did not see

3   these physicians face to face based on the

4   information was "hard to see"; so I spoke to some of

5   their representatives in their office and left

6   information for these providers.

7      Q  Is it accurate that Julia Schlomer, Dr. --

8   Julia Schlomer, Valerie Sorkin-Wells, and

9   Kathleen Schwartz are healthcare providers that you

10  had never seen face to face?

11     A  I believe of the three I've met

12  Sorkin-Wells; but I -- I had never met -- to my

13  recollect- -- recollection, I never met Dr. Schwartz

14  or Julie Schlomer.

15     Q  Did you call on Sorkin-Wells or -- I'm

16  sorry -- did you meet with Sorkin-Wells in her

17  office?

18     A  Yes.

19     Q  And was the purpose of your meeting

20  Sorkin-Wells in her office, when you met with her

21  face to face, to have a sales call?

22     A  I was there to promote and market the

23  products that I currently --

24     Q  Okay.

25     A  -- carried and -- and promoted for GSK at

1    that time.

2    Q  All right.

3        (The document referred to was marked as

4        Christopher Exhibit 35 by the Reporter.)

5        THE REPORTER:  35.

6    BY MS. JOHNSON:

7    Q  We'll do that one.  Go ahead.

8        Exhibit 35.  You've been handed Exhibit 35.

9    A  Okay.

10   Q  What's Exhibit 35?

11   A  This is an incident report for policy

12   violation, American Express, on January 26, 2007.

13   Q  Do you recall receiving Exhibit 35?

14   A  I -- yes.  I vaguely remember getting this

15   document, yes.

16   Q  And did you have a violation of the

17   company's AMEX policy?

18   A  I did not pay American Express for 90 days,

19   but I did eventually settle that.

20   Q  Okay.  But was it your understanding that

21   GSK's policy was that you were to pay

22   American Express within 90 days?

23   A  Yes.

24   Q  Okay.

25   ///

Christopher, Michael  4/22/2009  9:17:00 AM

1          (The document referred to was marked as

2          Christopher Exhibit 36 by the Reporter.)

3     BY MS. JOHNSON:

4        Q   I'd like to show you what's been marked

5     Exhibit 36.

6          Is Exhibit 36 a copy of a memo to a number

7     of people at GSK, including you, called "Definition

8     of a Sales Call," dated January 21st, 2007?

9          Do you recall receiving a copy of

10    Exhibit 36?

11       A   I -- I think I did.

12       Q   And was it your understanding from -- from

13    getting the email, which is Exhibit 36, that a sales

14    call was defined as having a face-to-face contact

15    with the healthcare prescriber?

16       A   That is -- yes.

17       Q   All right.

18          (The document referred to was marked as

19          Christopher Exhibit 37 by the Reporter.)

20    BY MS. JOHNSON:

21       Q   Do you have Exhibit 37?

22       A   Yes.

23       Q   Is Exhibit 37 a copy of the Complaint that

24    you and Mr. Buchanan have filed in this case?

25       A   Yes.

Christopher, Michael  4/22/2009  9:17:00 AM

1      Q   And we've talked about the list of

2    prescribers that you received from GSK.

3           Did you ever suggest or recommend to your

4    manager or to anyone at GSK that a particular

5    prescriber should be added to the list?

6      A   Not to my recollection unless there was a

7    physician that joined a practice.

8           There was a method that you could put a

9    request in, but then they'd have to look at data and

10   all that sort of thing; and then if they were added,

11   it was sent down from corporate office with all of

12   the information that was collected from -- from

13   those.

14          But I never added -- I never added or

15   deleted physicians.

16     Q   I understand you couldn't add or de- --

17   delete physicians from the list; but, if I

18   understood you correctly, there was a vehicle

19   through which you could suggest prescribers for GSK

20   to consider adding to the list.

21     A   Because I'm not familiar with that process.

22   I -- I believe that there was an avenue, yes, to

23   answer your question.

24     Q   Okay.  Did you ever talk -- you talked

25   about -- or you testified about having reviewed

1      I, ALTHEA L. MILLER, CSR No. 3353, certify:

2      That the foregoing deposition of

3 MICHAEL SHANE CHRISTOPHER was taken before me at the

4 time and place therein set forth, at which time the

5 witness declared under penalty of perjury to tell

6 the truth;

7      That the testimony of the witness and all

8 objections made at the time of the deposition were

9 recorded stenographically by me and were reduced to

10 a computerized transcript under my direction;

11     That this transcript is a true record of

12 the testimony of the witness and of all objections

13 and colloquy made at the time of the deposition.

14     I further certify that I am neither counsel

15 for nor related to any party to said action nor

16 interested in the outcome.

17     The certification of this transcript does

18 not apply to any reproduction of the same by any

19 means unless under the direct control and/or

20 direction of the certifying deposition reporter.

21     IN WITNESS WHEREOF, I have subscribed my

22 name this 27th day of April, 2009.

23

24     _____
      ALTHEA L. MILLER, CSR No. 3353, RPR

25

                             314